Susan and Reggie **GRIFFITH**, et al., **Plaintiffs–Appellants,**

v.

Marlin **JOHNSTON, Individually and as Commissioner of the Texas Department of Human Services, Defendant–Appellee.**

No. 88–7008.

United States Court of Appeals, Fifth Circuit.

May 4, 1990.

Rehearing and Rehearing En Banc Denied May 30, 1990.

Edwin N. Horne, Asst. Atty. Gen. and Jim Mattox, Atty. Gen., Austin, Tex., for defendant-appellee.

Before GEE, JONES and SMITH, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Eighteen adopted children and their twelve adoptive parents filed this civil rights action against the Texas Department of Human Services ("TDHS"), alleging that Texas' administration of its adoption program for "Hard-to-Place" children violated their constitutional rights to Due Process and Equal Protection. These complainants also raised several claims under the Adoption Assistance Act, 42 U.S.C. § 673. Concluding that the litigants failed to state a claim upon which relief could be granted, the district court dismissed the constitutional allegations without prejudice, retained the statutory claims for further proceedings, and entered final judgment pursuant to Fed.Rule Civ.Pro. 54(b). The Griffiths appealed. Finding that appellants did not allege a constitutionally sufficient liberty or property interest abridged by the TDHS, we affirm.

I.

NOTICE OF APPEAL

Before discussing the merits of this appeal, we must determine whether we have jurisdiction over these allegations. Although none of the parties have questioned our jurisdiction, it is the duty of this court to determine, *sua sponte* whether it has jurisdiction over any case before it. *Bender v. Williamsport Area School District*, 475 U.S. 534, 541–42, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986); *Spiess v. C. Itoh & Co. (America), Inc.*, 725 F.2d 970, 971 (5th Cir.), *cert. denied* 469 U.S. 829, 105 S.Ct. 115, 83 L.Ed.2d 58 (1984); *Matter of Kutner*, 656 F.2d 1107, 1110 (5th Cir. 1981) *cert. denied* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

Neil H. Cogan, Storey Hall, Dallas, Tex., for plaintiffs-appellants.

■ Both the appellants and the appellees treat this action as an appeal on behalf of all plaintiffs from the district court dismissal. However, the appellants styled their notice of appeal "Susan and Reggie Griffith, et al.", omitting the names of the other plaintiffs from the filing. The Supreme Court has held that the use of the phrase "et al." fails to provide the required notice of appeal to the opposing parties or to the court, since this designation does not identify all appealing parties. *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 2409, 101 L.Ed.2d 285 (1988); *Pope v. Mississippi Real Estate Commission*, 872 F.2d 127, 129 (5th Cir.1989). Fed. Rule App.Pro. 3(c).

When interpreting the *Torres* decision, the Fifth Circuit has recognized four situations where the "et al." designation will suffice for purposes of this notice requirement. If only two parties filed suit in the district court, the "et al." designation clearly refers to the unnamed party. *Pope*, 872 F.2d at 129. Similarly, where the notice of appeal lists only the named plaintiff in a class action, the "et al." designation adequately identifies the remaining members of the class. *Rendon v. AT & T Technologies*, 883 F.2d 388, 398 n. 8 (5th Cir.1989). If parents sue on their own behalf and on behalf of their children, the "et al." designation preserves the children's appeal, since the opposing party could anticipate that the parents would appeal in both their individual and representative capacities. *King v. Otasco, Inc.*, 861 F.2d 438, 443 (5th Cir.1988). Finally, where the notice of appeal defectively employs the "et al." designation, but where, within the 30 day deadline, plaintiffs file a "Memorandum in Support of Appellants' Motion for Injunction Pending Appeal" listing all plaintiffs to the original action, plaintiffs will have cured the original defect preserving all parties' rights to appeal. *Brotherhood of Railway Carmen v. Atchison, Topeka & Santa Fe Railway Co.*, 894 F.2d 1463, 1465 (5th Cir. 1990).

These exceptions do not assist the plaintiffs. Since more than one plaintiff besides the Griffith family filed suit in the district court, "et al." does not clearly designate only one remaining appellant. The district court never certified this case as a class action, and never appointed the Griffiths as the class representatives. *See Torres*, 108 S.Ct. at 2409; *Rendon*, 883 F.2d at 398 n. 8; *King*, 861 F.2d at 443. Plaintiffs never cured their defective notice of appeal within the 30 day deadline by filing a document listing all appealing plaintiffs. Under *King*, the "et al." designation does preserve the rights of the five Griffith children to appeal because their parents sued in both an individual and a representative capacity. However, as to all plaintiffs besides Susan and Reggie Griffith and their children, plaintiffs filed a defective notice of appeal.

Compliance with this notice requirement is a jurisdictional prerequisite. *Torres*, 108 S.Ct. at 2409; *Barnett v. Petro–Tex Chemical Corp.*, 893 F.2d 800, 805 (5th Cir.1990); *Smith v. White*, 857 F.2d 1042, 1043 (5th Cir.1988). An appellate court lacks jurisdiction over an intended appeal by parties other than those named in the notice. *Barnett*, 893 F.2d at 805. Consequently, we have no jurisdiction to address the merits of any claim besides those raised by the Griffiths on their own behalf and on behalf of their five children.

## II.

### TEXAS' ADOPTION PROGRAM

In order to adequately scrutinize the Griffiths' allegations, it is important to understand Texas' statutory framework regulating the supervision and placement of children.

Appellee Marlin Johnston is the Commissioner of the Texas Department of Human Services (TDHS), a state-created agency designed to implement Texas' human welfare programs. Tex.Hum.Res.Code Ann. §§ 21.004, 22.001 (Vernon 1980 & Supp. 1990). Commissioner Johnston exercises all rights, powers, and duties conferred by law on the department, unless the legislature delegates the duty to the Texas Board of Human Resources. Tex.Hum.Res.Code Ann. § 21.004(a) (Vernon Supp.1990). The Board appoints the commissioner, and

adopts policies and rules to govern the department's activities. Tex.Hum.Res. Code Ann. §§ 21.003(a), 21.004(b) (Vernon Supp.1990).

Among the many duties carried out by TDHS, the department "promote[s] the enforcement of all laws for the protection of dependent, neglected, and delinquent children and children who have no presumed father." Tex.Hum.Res.Code Ann. § 41.001 (Vernon Supp.1990). This mandate authorizes TDHS to bring a suit in state court to terminate the natural parent-child relationship, and to have the state appointed as managing conservator for the child. 2 Tex. Fam.Code Ann. §§ 11.01 et seq., 15.02, 15.-05(b), 14.01(a), (c) (Vernon 1986 & Supp. 1990).

Where a court has appointed Texas as managing conservator, the state must provide the child with "clothing, food, shelter and education," as well as "care, control, protection, moral and religious training, and reasonable discipline." 2 Tex.Fam. Code Ann. § 14.02(b) (Vernon 1986 & Supp. 1990). The statute also empowers the state to consent to "medical, psychiatric, and surgical treatment" on behalf of the child. 2 Tex.Fam.Code Ann. § 14.02(b)(5) (Vernon 1986 & Supp.1990). The state may employ and fund foster care as a temporary means to effectuate these statutory obligations. Tex.Hum.Res.Code Ann. § 41.021 (Vernon 1980 & Supp.1990); 2 Tex.Fam.Code Ann. §§ 18.01 et seq. (Vernon 1986 & Supp.1990).

Texas may also consent to the adoption of these children, after determining that the adoptive home fulfills the child's particular needs. 2 Tex.Fam.Code Ann. § 14.02(b)(8) (Vernon 1986 & Supp.1990); 4-81 Texas Department of Human Resources, Minimal Standards For Child Placing Agencies § 5300. Besides its traditional adoption programs, Texas administers a system "designed to promote the adoption of hard-to-place children." Tex.Hum.Res. Code Ann. § 47.002 (Vernon 1980). This program provides hard-to-place children who reside in foster homes at state or county expense with stable and secure permanent homes, while potentially reducing the costs paid by the state for foster care. Tex.Hum.Res.Code Ann. § 47.002 (Vernon 1980).

Hard-to-place children include those who are three years old or older, those who are difficult to place because of "age, race, color, ethnic background, language, or physical, mental, or emotional handicap," or those who are members of a sibling group that should be placed in the same home. Tex.Hum.Res.Code Ann. § 47.001 (Vernon Supp.1990). To encourage adoption of these children, Texas informs prospective adoptive parents about their availability, assists the adoptive parents with the adoption process, and provides financial support to parents including medical fees, and maintenance fees up to the cost of foster care. Adoptive parents might also qualify for adoption assistance under the Federal Adoption Assistance Act. 42 U.S.C. § 673(c).

Before placing a child for adoption under any program, TDHS must compile a report concerning the "health, social, educational and genetic history of the child to be adopted," as well as "any history of physical, sexual or emotional abuse." 2 Tex. Fam.Code Ann. §§ 16.032(a)–(e) (Vernon Supp.1990). The prospective adoptive parents and the court reviewing the adoption must receive a copy of this report "edited to protect the identity of the birth parents and their families." The state must also inform the parents of their right to examine all records and other information related to the history of the child. 2 Tex.Fam. Code Ann. §§ 16.032(a)–(e), (n), 16.09, 34.08 (Vernon Supp.1990). Any parents who adopted children before the effective date of this act may receive copies of this information from the state. 2 Tex.Fam.Code Ann. § 16.032 (Vernon Supp.1990).[1]

---

1. Between 1984 and this amendment to the statute in 1989, TDHS was not required to reveal information about child abuse in this report. Further, adoptive parents received only a *summary* of the report, edited to protect the *confidentiality* of the birth family, rather than a *copy* edited to protect the family's *identity*. 2 Tex. Fam.Code Ann. § 16.032 (Vernon 1986).

Along with these legislative requirements, TDHS has formulated its own "management policies" to instruct staff members about how to handle adoptions. Before the adoptive parents meet the child, TDHS personnel must "discuss with the parents *all* information contained in the child's adoptive readiness study." 86–2 Texas Dept. of Human Services, Child Protective Services Handbook §§ 6930–31 (March, 1986). This information includes all available medical data, all known hereditary conditions, the existence and significance of handicaps, and the need for medical and psychological treatment. Child Protective Services Handbook at §§ 6930–31; 4–81 Texas Department of Human Resources, Minimal Standards For Child Placing Agencies § 5300(5). Where the child is handicapped or receiving therapy, the worker must encourage the parents to talk with the child's physician or therapist "to understand the implications of the child's condition." Child Protective Services Handbook at §§ 6930–31. TDHS staff members must also "[h]elp the family resolve fears and concerns they have about the child, the child's background, the placement, and their ability to parent the child." *Id.* at § 6931.

At the time of adoption, the staff worker gives the parents the child's medical records, as well as the written report compiled by TDHS pursuant to state statute. *Id.* at § 6933; Minimal Standards For Child Placing Agencies at § 5300(5). The staff worker must also determine whether the family qualifies for any post-adoption services, including "financial assistance, respite care, placement services, parenting programs, support groups, counseling services, and medical aid." Tex.Hum.Res. Code Ann. §§ 47.031–47.032 (Vernon Supp. 1990). Any post-adoption plan must identify "services needed by the child and family, possible sources for securing the services," and appropriate disciplinary methods to be used, depending upon the child's disciplinary needs. 86–2 Texas Dept of Human Services, Child Protective Services Handbook § 6935 (March, 1986).

After the adoption, TDHS must monitor the placement for a minimum of six months to ensure that the placement adequately meets the child's requirements. If "the placement is unsatisfactory," TDHS must remove the child from the adoptive home. Minimal Standards For Child Placing Agencies at § 5400(1).

Although TDHS consents to, facilitates and monitors placements via these guidelines, state courts perform the ultimate review of the adoption before issuing the adoption decree. 2 Tex.Fam.Code Ann. § 16.08 (Vernon 1986). In scrutinizing the placement, the court must satisfy itself that the statutory requirements for adoption have been met, and that the adoption is in the best interests of the child. *Id.; Green v. Remling*, 608 S.W.2d 905, 908 (Tex.1980); *Davis v. Collins*, 147 Tex. 418, 216 S.W.2d 807 (1949); *Hursey v. Thompson*, 141 Tex. 519, 174 S.W.2d 317 (1943); *Hopper v. Brittain*, 612 S.W.2d 636 (Tex. Civ.App.1981). The trial court is "invested with broad discretionary power in determining the best interests of the children." *In re W.E.R.*, 669 S.W.2d 716, 716 (Tex. 1984); *Green*, 608 S.W.2d at 908. Thus, both TDHS and Texas state courts implement the adoption system mandated by the Texas legislature, to ensure that all adoptions fulfill the needs of the adoptive families and their adopted children.

### III.

### BACKGROUND

Despite these extensive statutory safeguards and the comprehensive review available at several stages in Texas' adoption system, appellants allege that TDHS violated their Due Process and Equal Protection rights by failing to release information to the adoptive parents regarding the children's backgrounds and by failing to provide adequate services to the adopted children. When reviewing a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6),[2] we must accept all of the

---

2. Appellees contend that because they submitted affidavits in conjunction with their 12(b)(6) mo-

tion to dismiss for failure to state a claim, the district court should have treated that motion as

plaintiffs' well pleaded facts as true and view them in the light most favorable to the plaintiffs. *Carpenters Local v. Pratt–Farnsworth,* 690 F.2d 489, 500 (5th Cir. 1982) *cert. denied* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); *Dike v. School Board,* 650 F.2d 783, 784 (5th Cir.1981). We cannot affirm the district court "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Pratt–Farnsworth,* 690 F.2d at 500; *Ware v. Associated Milk Producers, Inc.,* 614 F.2d 413, 415 (5th Cir.1980).

The tangled procedural posture of this case, when combined with the plaintiffs' generalized pleading, complicates our review under this standard. In their original complaint as well as in their numerous briefs filed at varying stages, plaintiffs failed to connect their factual allegations to particular plaintiffs.[3] Only the Griffiths appear before us on this appeal. Consequently, we must look to their specific contentions to ascertain whether their complaint has any merit. However, we cannot disentangle the allegations which apply directly to the Griffiths from those allegations implicating other plaintiffs. Since we conclude that none of these allegations are sufficient to state a cause of action under 42 U.S.C. § 1983, we will assume that all generalized pleadings apply to the appellants. Employing these standards, the Griffiths' complaint reveals the following facts.

Between 1976 and 1982, the Griffiths adopted five children from the Texas Department of Human Services. TDHS had terminated the natural parents' rights to these children and had acted as managing conservator before making these permanent placements.

The children were categorized as "hard-to-place" or "special needs" children. Complaint, ¶ 16. The Griffiths believe that their children might have been physically, sexually, and emotionally abused by their biological parents, or at least that the biological parents failed to care for the children's handicaps and medical needs. Complaint, ¶ 17. The Griffiths further allege that several policies and practices followed by TDHS prevented the agency from learning about these problems and from communicating these problems to the parents.

While TDHS had custody and control of the Griffith children, TDHS intentionally or recklessly failed to hire "psychologists and

---

a rule 56 motion for summary judgment. We reject this argument.

Rule 12(b)(6) permits the district court, in its discretion, to consider materials outside the pleadings when adjudicating the motion to dismiss, thereby converting the motion into one for summary judgment. However, where the wording of the district court's order clearly indicates that the court did not consider any "extra-pleading" matters, the appellate court must treat the decision as one under Rule 12(b)(6). *Rutherford v. United States,* 702 F.2d 580, 581 n. 1 (5th Cir.1983); *Ware v. Associated Milk Producers Inc.,* 614 F.2d 413, 414–15 (5th Cir.1980). Further, when a 12(b)(6) motion is converted into one for summary judgment, the district court must provide notice to the parties. *Clark v. Tarrant County,* 798 F.2d 736, 745 (5th Cir. 1986).

In this case, the District Court clearly dismissed appellant's claims "without prejudice for failure to state a claim upon which relief could be granted." The district court did not notify either party that it intended to construe this motion as one for summary judgment. Consequently, we will treat this as a 12(b)(6) dismissal.

3. Along with not attaching allegations to specific plaintiffs, the complaint also fails to plead factual details including when the alleged deprivations occurred, who perpetrated the deprivations, and exactly what the responsible individual(s) did to violate plaintiffs' rights. While federal pleading rules permit notice pleading, this circuit has consistently advocated the better practice of pleading specific facts rather than conclusory allegations in cases under 42 U.S.C. § 1983. *Jacquez v. Procunier,* 801 F.2d 789, 792 (5th Cir.1986); *Morrison v. City of Baton Rouge,* 761 F.2d 242, 244 (5th Cir.1985); *Sherman v. Yakahi,* 549 F.2d 1287, 1290 (9th Cir.1977). Particularly when the complaint relies upon a specific constitutional provision, we have found the pleadings insufficient to give adequate notice where those pleadings merely cite the relevant provision and plead legal conclusions to support the claims. *Hanson v. Town of Flower Mound,* 679 F.2d 497, 504 (5th Cir.1982). Since plaintiffs' complaint frequently relies on vague generalities and legal conclusions to plead this cause of action, appellants' complaint borders on legal insufficiency.

similar personnel who have training and competence regarding problems peculiar to children with special needs." Complaint, ¶¶ 26–27. The psychologists whom TDHS did employ were not "competent to learn and communicate the information essential for parents to make informed adoption decisions" and to provide minimally adequate care for their children. Complaint, ¶ 26. TDHS employed deficient personnel in order to avoid paying the salary of specially-trained psychologists. Complaint, ¶ 27.

During the adoption phase of the program, the Griffiths contend that TDHS withheld "many of the facts essential to the *care and treatment* of children with special needs—including facts about the existence or extent of physical, sexual and emotional abuse; mental and physical handicaps and medical needs of the children; and other vital information, such as the social, genetic and medical history of the biological parents and the children's siblings." (emphasis added) Complaint, ¶ 19. TDHS followed this practice despite the comprehensive statutory and regulatory structure requiring disclosure of medical and psychological information, and with reckless disregard for the interests of the children and the adoptive parents. TDHS resorted to this "policy" in order to induce the adoption of special-needs children. Complaint, ¶ 20.

TDHS also failed to provide sufficient assistance to the Griffiths during the post-placement and post-adoption period. TDHS neglected to train social workers and similar personnel to provide post-adoption services. Complaint, ¶ 30. TDHS also declined to instruct the Griffiths about how to care adequately for their children. *Id.* Finally, TDHS intentionally elected not to provide post-adoption services for these children, even though the agency served children in TDHS custody, contending that adoption terminated TDHS' obligations. Complaint, ¶ 34. The Griffiths believe that TDHS sought to cut its administrative costs by withholding training and services. Complaint, ¶¶ 31, 35, 39.

These "policies and practices" allegedly injured the Griffiths in several ways. In order to make an informed decision about whether to adopt their children, the parents required facts about the abuses suffered by the children and about the children's handicaps and medical needs. Complaint, ¶ 18. Without this information the Griffiths also could not provide "the kind of care and treatment that was and is at least minimally adequate." *Id.* The parents commenced medical and psychological treatment only after the children's problems became evident during the children's pre-teen and teen years.

By this time, some of the adopted children had attacked parents and siblings with lethal weapons, destroyed or threatened property within the home, and committed other criminal acts against the community. Plaintiff's Brief in Opposition to Motion at R. 103. The delay in treatment traumatized the children and increased the financial burden borne by the parents. Complaint, ¶¶ 21–23. Some of the children have been institutionalized in public or private residential treatment centers and psychiatric institutions at the cost of tens of thousands of dollars per month. Complaint, ¶ 22.

Since the Commissioner "knew or should have known that these injuries would occur, and acted recklessly or intentionally toward the parents and children in causing them to occur," appellants conclude that the Commissioner violated appellants' constitutional rights. As a remedy for these injuries, appellants ask the Commissioner to disclose the adopted children's files to facilitate adequate professional care for the children.[4] The Griffiths also request that Texas provide services for the children, to raise the children to the level that they would have attained but for the Commissioner's policies, and to equalize Texas' treatment of special needs children in and out of state custody.

We must decide whether the Griffiths' factual allegations state a cause of action for relief under the Due Process and Equal

---

**4.** In their reply brief, Appellants concede that a Texas law enacted in 1989 moots this request by specifically codifying adoptive parents' rights to receive a history of the adoptees.

Protection Clauses of the Fourteenth Amendment to the United States Constitution.

## IV.

## DUE PROCESS

■ The Due Process Clause provides "nor shall any state deprive a person of life, liberty or property without due process of law." In order to state a cause of action for violation of the Due Process Clause under Section 1983, the appellants must show that they have asserted a recognized "liberty or property" interest within the purview of the Fourteenth Amendment, *Board of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); *Neuwirth v. Louisiana State Board of Dentistry,* 845 F.2d 553, 557 (5th Cir.1988); *Phillips v. Vandygriff,* 711 F.2d 1217, 1221 (5th Cir.1983), *cert. denied* 469 U.S. 821, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984); and that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law, *Daniels v. Williams,* 474 U.S. 327, 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 347–48, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986); *Brantley v. Surles,* 718 F.2d 1354, 1357 (5th Cir. 1983). The Supreme Court has expanded the definition of "liberty" beyond the core textual meaning of that term to include interests arising from the specific privileges enumerated by the Bill of Rights, and from the "fundamental rights implicit in the concept of ordered liberty" and "deeply rooted in this Nation's history and tradition" under the Due Process Clause. *See Michael H. v. Gerald D.,* — U.S. —, 109 S.Ct. 2333, 2341, 105 L.Ed.2d 91 (1989) (Scalia, J.); *Bowers v. Hardwick,* 478 U.S. 186, 191, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986); *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983); *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977).

Under traditional notions of Due Process, the fourteenth amendment was "intended to secure the individual from the *arbitrary exercise* of the powers of government" which resulted in "grievous losses" for the individual. (emphasis added). *Kentucky Dept. of Corrections v. Thompson,* — U.S. —, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989); *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). However, not every "grievous loss" implicates constitutional concerns. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). *See Jago v. Van Curen,* 454 U.S. 14, 17, 102 S.Ct. 31, 34, 70 L.Ed.2d 13 (1981); *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). Courts must resist the temptation to augment the substantive reach of the Fourteenth Amendment, "particularly if it requires redefining the category of rights deemed to be fundamental". *Michael H.,* — U.S. at —, 109 S.Ct. at 2341; *Hardwick,* 478 U.S. at 194–95, 106 S.Ct. at 2846. As Justice White cautioned:

That the court has ample precedent for the creation of new constitutional rights should not lead it to repeat the process at will. The Judiciary, including [the Supreme] Court is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution. Realizing that the present construction of the Due Process Clause represents a major judicial gloss on its terms, as well as on the anticipation of the Framers, ... the Court should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare. Whenever the Judiciary does so, it unavoidably pre-empts for itself another part of the governance of the country without express constitutional authority.

*Moore,* 431 U.S. at 544, 97 S.Ct. at 1958 (White, J. dissenting). *See Michael H.,* — U.S. —, 109 S.Ct. at 2341 (Scalia, J., plurality opinion); *Hardwick,* 478 U.S. at 194–95, 106 S.Ct. at 2846.

■ Appellants allege that they suffered physical, emotional and monetary injuries

at the hands of TDHS. Their contentions resemble tort claims for negligence and misrepresentation. We may not, however, animate every traditional tort cause of action with constitutional significance. Section 1983 imposes liability for deprivations of constitutionally protected rights, rather than for violations of tort duties of care. *Daniels,* 474 U.S. at 332–33, 106 S.Ct. at 665–66; *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). *See DeShaney v. Winnebago County DSS,* — U.S. —, 109 S.Ct. 998, 1006–7, 103 L.Ed.2d 249 (1989); *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976).

Bearing in mind these interpretive principles, we shall try to ascertain whether the appellants' tort-like allegations also embody interests or a deprivation which merits constitutional scrutiny.

### 1. *Appellants' Complaint.*

Appellants have hindered our review by repeatedly recharacterizing the nature of their asserted rights. The original complaint alleged that "special needs" children have a liberty interest in "the kind of care and treatment [from the state] that was and is at least minimally adequate", including the provision of post-adoption services. Their adoptive parents asserted concomitant liberty interests in receiving adequate information to make an informed adoption decision and sufficient training to enable the parents to care for their adopted children. Complaint, ¶ 18.

In their brief in opposition to TDHS' Motion to Dismiss, filed in district court, appellants abandoned these original allegations, speaking instead of the children's "liberty interests in living in non-restrictive circumstances, in being autonomous, and [in] fulfilling each of their individual personalities." The parents' rights were now said to include a liberty interest in "raising a family as befits their deepest wishes and convictions, and a property interest in preserving their resources." *Id.*

Before our court, appellants' original brief amalgamates and modifies these two viewpoints into yet a third position. The children's liberty interests suffer "in all the ways that flow from not being cared for and treated properly for years," including that "some children have police records that they might not have otherwise had." Appellants' Brief at 13. In addition, the children suffered injury to their property interests because "the more thousands that their parents have spent for treatment, the less money there has been for the children." *Id.* at 13–14. The children now deny that they advanced a "right to services" as one of their protected interests. From the Griffiths' perspective, the Commissioner's program "is equivalent to his taking of their property or his quartering of soldiers in their homes." *Id.* at 17. The adopted children physically injured other family members, destroyed property, and disrupted families and marriages. By inducing the Griffiths to adopt their children under what amounted to false pretenses, the state interfered with the parents' right to be free from these consequences. The parents even allege that they might not have adopted the children had they "known the truth."

At the beginning of their reply brief, appellants repudiate these new claims and revert to their original allegations, including that TDHS deprived appellants of their protected rights by failing to provide adequate post-adoption services. Appellant's Reply Brief at 7. Several pages later, appellants contradict this position, just as they did in several other briefs, by professing that "plaintiff parents and children have never sought to establish any ... fundamental rights [in securing records and services]." *Id.* at 13.

Instead, appellants seek recognition that TDHS' adoption program endangered the children by removing them from "the hands of persons with *knowledge of their backgrounds* of abuse handicap and medical need" and placing them in a "dangerous situation" with parents who "attempt to raise them without the most crucial information about the children's backgrounds." *Id.* at 13. By asserting that TDHS knew about the children's handicaps, this new allegation negates appellants' prior claims

that TDHS failed to develop adequate information about these children. In the end, appellants conclude that this court need not even undertake a fundamental rights analysis regarding the injuries asserted here, since TDHS' conduct "shocks the conscience."

Despite this last suggestion, we must determine whether the Griffiths have alleged a deprivation of any "liberty" or "property" interests protected under the Due Process Clause. Appellants have not founded their claims on specific provisions in the Bill of Rights. Consequently, the Griffiths will receive due process protection only if their asserted interests are "fundamental" in the constitutional sense, or if they have been deprived of property interests under state law. Because the Griffith parents and children assert different liberty interests for which they seek constitutional protection, their claims deserve separate treatment.

### 2. *Liberty Interests—The Parents.*

█ The parents essentially contend that TDHS coerced or duped them into adopting by placing the children in their adoptive home without developing complete information about the children's backgrounds and without releasing all available information to the parents. They argue that this practice amounts to government interference with their "fundamental interest" in deciding to adopt, because it violates their right to "informed" decision-making on behalf of their family.

Although the Supreme Court has rendered decisions defining various elements of family relationships as "fundamental interests," [5] none of those cases announced a "fundamental interest" in adopting children. What consequences would flow from the recognition of such an interest are un-

clear. The adoption process is now heavily regulated by states for the protection of all parties involved. *See* discussion in *Part II supra.* If the right to adopt is "fundamental," must the courts review whether states may require that adoptive parents be sane, honest, financially capable or otherwise qualified to be good parents? When does the "fundamental right to adopt" overcome the right of privacy of the birth parents? May the state decide that certain kinds of children, contrary to the wishes of particular prospective parents, may not be adopted? To assert that such an individualized "fundamental right" exists is sloganistic and oxymoronic, since society must balance the interests of at least three parties—birth parents, child, adoptive parents—when legitimating adoptions. The Griffith parents do not pose these questions, but they seem to be the inevitable result of a determination that adoption is a "fundamental right." Bearing in mind Justice White's admonition against the creation of novel fundamental rights, we cannot recognize a "fundamental right" to adopt a child.

The parents would respond that the fundamental interest for which they seek recognition is narrower than we construe it, because it arises from the state's responsibility toward them after they became prospective adoptive parents. Perhaps the "fundamental right" can be regulated by the state at the outset, they would concede, but once the state approved them as adoptive parents, it could not "interfere" with their decision by providing incomplete or misleading information about the children. We believe it to be highly dubious that a "fundamental right to adopt" could be confined as the Griffith parents suggest, but even on those terms, the "fundamental interest" in "informed decision making"

**5.** *Michael H. v. Gerald D.,* —— U.S. ——, 109 S.Ct. 2333, 2342, 105 L.Ed.2d 91 (1989); *Lehr v. Robertson,* 463 U.S. 248, 256–58, 103 S.Ct. 2985, 2990–91, 77 L.Ed.2d 614 (1983); *Santosky v. Kramer,* 455 U.S. 745, 753–64, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982); *Smith v. Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 845–46, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977); *Moore v. City of East Cleveland,* 431 U.S. 494, 498–99, 97 S.Ct. 1932,

1935–36, 52 L.Ed.2d 531 (1977) (plurality opinion); *Cleveland Board of Education v. La Fleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796–97, 39 L.Ed.2d 52 (1974); *Wisconsin v. Yoder,* 406 U.S. 205, 231–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1943).

which they advocate continues to come up short constitutionally.

The parents' formulation of their "right" is necessarily characterized not in terms of an action they may take autonomously, as in the conventional substantive due process cases,[6] but is gauged according to some hypothetical entitlement from the state. The Griffiths do not tell us precisely what information, training or services they should have received from the state before deciding to adopt five hard-to-place children, but they are sure that what they received was not enough. "Not enough" therefore should "shock the judicial conscience" and entitle them to a remedy founded on the Constitution. The Constitution should be held to require "more"—information, training and/or services both before and after such adoptions. The Griffiths' claim starkly raises the distinction between governmental interference and governmental assistance as a basis for Due Process relief. However, as the Supreme Court explained in *DeShaney v. Winnebago County DSS*, —— U.S. ——, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989):

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security.... [I]ts language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means....
>
> Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive the individual. (citations omitted).

See also, *Webster v. Reproductive Health Services*, —— U.S. ——, 109 S.Ct. 3040, 3051, 106 L.Ed.2d 410 (1989); *Youngberg v.*

*Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982); *Harris v. McRae*, 448 U.S. 297, 317–18, 100 S.Ct. 2671, 2688–89, 65 L.Ed.2d 784 (1980) (no obligation to fund abortions or other medical services).

Requiring TDHS to develop and present additional information to the prospective parents and to train prospective parents about how to care for handicapped children would amount to a mandate that TDHS provide additional affirmative governmental assistance to secure the ability to adopt. *DeShaney* demonstrates that the Due Process Clause does not demand positive assistance to secure constitutional rights. Moreover, by obligating TDHS to research potential consequences of a child's mental or emotional handicap, as the Griffiths urge, we would convert TDHS from an agency providing adoption assistance to an insurer of the child's physical and mental health. This result, too, is contrary to *DeShaney*. While information and training provided by the state may aid parents in caring for their adopted special-needs children, the state and not the courts should determine whether and in what forms to provide that aid. Characterizing the Griffiths' claims as a violation of a "fundamental right" would upset the balance the state has struck without furnishing any guidance for "constitutional" adoption programs beyond the preference of the trial court or this court. Appellant parents have not advanced a "liberty interest" of which they were deprived by the state.

### 3. *Liberty Interests—The Children.*

The Griffith children advance two liberty interests distinct from those asserted by their parents: their interest in the "uninhibited development of their personalities" and their "interest in living in non-restrictive circumstances."

■ The Supreme Court's decisions regarding "fundamental interests" are more easily enumerated than analyzed. Building logically on past decisions to define a new "fundamental right" is, to put it mildly,

---

**6.** *Moore,* 431 U.S. at 495, 97 S.Ct. at 1932; *LaFleur,* 414 U.S. at 640–47, 94 S.Ct. at 796–99; *Yoder,* 406 U.S. at 213–15, 92 S.Ct. at 1532–33; *Stanley,* 405 U.S. at 645, 92 S.Ct. at 1208.

difficult. In this case, however, we easily conclude that the "personality interests" asserted by the Griffith children are beyond anything even remotely suggested in other substantive due process cases and, indeed, would require a breathtaking extension of that doctrine. The children allege nothing less than the state's responsibility to have maximized their personal psychological development. This obligation, and the appellants' "right," are said to derive from the state's having once been a custodial parent for the children. Fulfillment of the "right" is measured by vague and imprecise criteria which boil down to (1) a demand for services by the state to "remedy" the damage it allegedly did and (2) an invitation for the federal courts to specify the level of remedy in such a way as essentially to engineer the state's social program. This affirmative "right" is wholly different from the libertarian, autonomous rights created in previous substantive due process cases.[7] Although the children's "right" is described differently from the Griffith parents' asserted "right to adopt," it suffers from the same flaw, *i.e.,* its essential reliance on affirmative acts by the state. *DeShaney* forecloses the recognition of the children's claim as it did that of the parents.

■ The Griffith children also assert their right to live in unrestrictive circumstances, as supported by the Supreme Court's "special relationship" cases. *See Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2459. These cases are completely inapposite. A special relationship exists "when the State by an affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." *DeShaney,* —— U.S. at ——, 109 S.Ct. at 1005. Although the Due Process Clause generally does not require a governmental body to assist the public, a duty to provide adequate protective services may arise out of "special relationships" created

or assumed by the state with regard to particular individuals. *DeShaney,* —— U.S. at ——, 109 S.Ct. at 1004. This relationship has arisen when a state "takes a person into its custody and holds him there against his will." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (prisoners); *Hamm v. DeKalb County,* 774 F.2d 1567 (11th Cir.1985), *cert. denied* 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986) (pretrial detainees); *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (criminal suspects injured during apprehension); *Youngberg,* 457 U.S. at 316–318, 102 S.Ct. at 2458–59 (1982) (institutionalized mentally retarded persons).[8] It is essential to realize that the state's duty to provide services stems from the limitation which the state has placed on the individual's ability to act on his own behalf, and not from the state's knowledge of the individual's predicament or from its expressions of intent to help him. *DeShaney,* 109 S.Ct. at 1006.

■ TDHS created a "special relationship" with the Griffiths' children when it removed them from their natural homes and placed them under state supervision. At that time, TDHS assumed the responsibility to provide constitutionally adequate care for these children. Appellants do not allege that TDHS neglected its duties while the children remained under TDHS custody —indeed, they aver that children under state care received superior assistance over children in private homes. Further, appellants do not precisely assert that Texas arranged for inadequate permanent placement in their family. Instead, they urge us to recognize an ongoing special relationship between TDHS and the adopted children, which requires TDHS to extend additional services. The Supreme Court has rejected a similar claim. In *DeShaney,* 109 S.Ct. at 1006, the Court found that, although Wis-

---

7. *See* n. 6 *supra.*

8. *Taylor by and Through Walker v. Ledbetter,* 818 F.2d 791, 796–98 (11th Cir.1987) *cert. denied* —— U.S. ——, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Doe v. New York City Department of*

*Social Services,* 649 F.2d 134 (2nd Cir.1981) *cert. denied* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *White v. Rochford,* 592 F.2d 381 (7th Cir.1979). The "liberty interests" recognized in these cases have not been considered by our court or by the Supreme Court.

consin had assumed a special relationship towards Joshua when it removed Joshua from his natural home, the state terminated this relationship when it returned Joshua to his parents, even though the state knew that such action might endanger Joshua. As the Court reasoned:

> The State does not become the permanent guarantor of an individual's safety having once offered him shelter.

*Id.* at 1006.

When TDHS placed the children in the Griffiths' home, the Griffiths assumed the same rights and duties towards the children as natural parents. 2 Tex.Fam.Code Ann. § 16.09(a) (Vernon 1986 & Supp.1990). That TDHS once acted as guardian for the children does not oblige the state to provide continual services to those children placed in permanent homes. Any "liberty interest" that the children might have asserted under the "special relationship" doctrine while in state custody lapsed when the parents officially adopted the children. Thus, appellants' complaint has not advanced a constitutionally protected liberty interest.

#### 4. *Property Interests.*

Appellants' complaint could still state a claim under the Due Process Clause if it raises a cognizable property interest of which Texas deprived the appellants. "The hallmark of property ... is an individual entitlement grounded in state law which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982). Appellant parents assert that TDHS deprived them of two property interests: basic services provided by Texas and money which the parents spent to care for the "special needs" children. Neither of these arguments survives scrutiny.

▌ Appellants have not demonstrated an entitlement to post-adoption services or training under state law. The statutes regulating adoption in Texas permit TDHS to provide services to adoptive families, but the social worker has discretion to determine whether or not the family qualifies for the benefits. Tex.Hum.Res.Code Ann.

§§ 47.031–47.032 (Vernon Supp.1990). Where the enabling statute confers discretion on the state agency without providing objective criteria for and limitations on that discretion, the statute does not create an entitlement for Due Process purposes. *See Board of Pardons v. Allen,* 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987); *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 465, 101 S.Ct. 2460, 2464–65, 69 L.Ed.2d 158 (1981); *Neuwirth,* 845 F.2d at 557. Consequently, the Griffiths do not hold a property interest in TDHS training and services.

▌ The Griffiths do hold a property interest in their monetary resources. However, TDHS did not "deprive" them of this interest. TDHS did not require the parents to make any particular expenditures on behalf of their children. The parents elected to adopt hard-to-place children and could have anticipated that the expenses to care for these children would exceed those for a normal child. To make TDHS responsible for these added expenditures would, again, convert TDHS into an insurer of adoptions. Any adoptive parent who expended more money than anticipated to care for an adopted child could contend that the state should subsidize this added burden.

▌ The Griffiths seek to refine their position, contending that if TDHS had provided additional information about these children's backgrounds, the family would have pursued immediate medical and psychological care for the children, thereby incurring lower treatment expenses. This argument merely raises the adequate information claim in another context and suffers from the same deficiency. While the state may not interfere with a parent's right to make treatment decisions on behalf of a child, the state need not, as a matter of constitutional duty, help the parents diagnose the problem and locate the cheapest treatment alternative. *DeShaney,* —— U.S. at ——, 109 S.Ct. at 1003; *Youngberg,* 457 U.S. at 317, 102 S.Ct. at 2459. The parents have not alleged a claim for the deprivation

of a constitutionally protected property interest.

Since the appellants have failed to advance a liberty or property interest which merits Due Process scrutiny, they have failed to state a claim under the Due Process Clause of the Fourteenth Amendment.

## V.

### EQUAL PROTECTION

 In addition to their Due Process claim, appellants have alleged that TDHS' adoption program, as implemented, violates the Equal Protection rights of adopted children by providing greater services to children in state custody than to children in private custody. The Equal Protection Clause of the Fourteenth Amendment commands that no State "shall deny to any person within its jurisdiction the equal protection of the laws." Its mandate requires a state to treat all similarly situated persons alike. *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 442, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985); *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Appellants' error rests in the contention that their children and children remaining in state custody are similarly situated for purposes of the Equal Protection Clause.

When Texas removes children from the custody of their natural parents, the state becomes the managing conservator for those children. 2 Tex.Fam.Code Ann. §§ 11.01 *et seq.*, 15.02, 15.05(b), 14.01(a), (c) (Vernon 1986 & Supp.1990). As managing conservator, the state has a duty to provide the children with "clothing, food, shelter and education", as well as "care, control, protection, moral and religious training, and reasonable discipline." 2 Tex.Fam. Code Ann. § 14.02(b) (Vernon 1986 & Supp. 1990). *See DeShaney*, —— U.S. ——, 109 S.Ct. at 1005–06; *Youngberg*, 457 U.S. at 316–18, 102 S.Ct. at 2452; *Lelsz v. Kavanagh*, 807 F.2d 1243, 1250 (5th Cir.1987). The state's responsibility terminates when the state court finalizes the adoption, and the adoptive parents assume all rights and responsibilities over the child, including the support responsibilities previously placed on the state. 2 Tex.Fam.Code Ann. §§ 12.- 04, 16.09(a) (Vernon 1986 & Supp.1990).

Adopted children who rely upon their adoptive parents for support and children under state conservatoires, are in no way similarly situated with regard to the medical and psychological services provided by the state. The state has no responsibility to treat these disparately situated children identically. Appellants have failed to state an Equal Protection cause of action.

## VI.

### CONCLUSION

This court does not ignore the tragic circumstances that led the Griffiths to file suit. Any parent's heart would be torn by the knowledge that a child, burdened by severe psychological troubles, has wounded himself and his family. Tragedy does not necessarily presuppose a constitutional violation, however, and we have found none based on the Griffiths' pleadings. We express no opinion, of course, on the merits of their other Federal or State-law claims.

We AFFIRM the judgement of the district court.