**DEL A., et al.**

v.

**Charles "Buddy" ROEMER, et al.**

**Civ. A. No. 86–801.**

United States District Court, E.D. Louisiana.

Oct. 21, 1991.

---

Christopher A. Hansen, Jeffrey B. Gracer, American Civil Liberties Union, Children's Rights Project, New York City, Steven R. Scheckman, New Orleans, La., for plaintiff Brendolyn A.

David Anthony Dalia, Louisiana Office of Atty. Gen., Arthur A. Lemann, III, Lemann, O'Hara & Miles, New Orleans, La., for plaintiff Charlotte O.

Mary Beck Widmann, Dept. of Social Services, New Orleans, La., for defendant Melvin Meyers, Jr.

## MEMORANDUM AND ORDER

SEAR, District Judge.

This civil rights action was filed February 25, 1986 on behalf of children in foster care under the supervision of the Louisiana Department of Health and Human Resources ("DHHR"). An amended complaint was filed on April 28, 1986. Plaintiff children challenged the adequacy of Louisiana's child welfare system under the Adoption Assistance and Child Welfare Act of 1980 ("Child Welfare Act"), 42 U.S.C. §§ 620 *et seq.* & §§ 670 *et seq.*, and the United States Constitution. Jurisdiction arises under 28 U.S.C. §§ 1343(a)(3), 2201 and 2202. Venue is proper in the Eastern District of Louisiana.

1. DSS is the successor to DHHR.

The original plaintiffs were fifteen children, suing on their own behalf and on behalf of a putative class of all others similarly situated. Named as original defendants were then governor of Louisiana Edwin Edwards, Secretary of DHHR Sandra L. Robinson, Assistant Secretary of DHHR for the Office of Human Development Wayne C. Heap, and Under Secretary of DHHR Melvin Meyers, Jr. Claims against these defendants in their individual capacities were subsequently dismissed. Current holders of these State positions have been substituted as defendants: Governor Charles "Buddy" Roemer, Secretary of the Department of Social Services ("DSS")[1] May Nelson, and Assistant Secretary of DSS for the Office of Community Services ("OCS") Brenda L. Kelley.

Causes of action were originally pursued for money damages and injunctive and declaratory relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 & 2202. On January 13, 1989, plaintiffs dismissed their damage claims. Plaintiffs allege the existence and violation of a variety of rights created by the Child Welfare Act and enforceable in a § 1983 action. Plaintiffs also allege deprivations of protected liberty and property interests and substantive due process in violation of the Fourteenth Amendment of the United States Constitution.

Trial first commenced on March 6, 1989. Prior to trial nine plaintiffs were dismissed because they were no longer in State custody. Following two days of testimony, I expressed the belief that plaintiffs had established *prima facie* violations of law. At that time, it was apparent to me that Dr. Jeanne Hunzeker, Associate Dean of the School of Social Work at Southern University of New Orleans, plaintiff's expert in child care,[2] and assistant secretary Kelley each wanted to provide the finest child care plan for Louisiana's children that could be developed, applying well-accepted social work policies and practices within the framework of applicable State and Federal statutes and regulations. I recognized that

2. Dr. Hunzeker directed the Child Welfare League of America's standards-setting efforts.

the parties' experts were in a far better position than I or anyone selected by me to draft a plan that would be within the law and in keeping with the best professional practices. I therefore encouraged the parties to resolve their differences by negotiating a plan for the improvement of the Louisiana child welfare system. The parties agreed. Consequently, trial was continued indefinitely to enable Dr. Hunzeker and Ms. Kelley to develop the plan.

Prior to and during the trial and in response to plaintiff's requests for class certification, the State stipulated that any remedies provided as a result of this litigation would extend not only to plaintiffs but also to all those similarly situated and all those at risk of being placed in foster care. The stipulation was extended to the negotiated plan as well.

Negotiations between the parties were conducted solely by the designated experts, without interference of counsel or me. However, the experts kept me informed of the progress of their weekly meetings. Following completion of the plan, copies were given to the parties for comment and then returned to the experts for inclusion of those comments which the experts considered appropriate.

On October 27, 1989, the Proposed Plan for Improvement of the Louisiana Child Welfare System (the "Plan") was submitted to the court, with revisions reflecting the comments of plaintiffs and defendants' counsel that the experts believed conformed to the standard under which this Plan was developed. A copy of this revision was furnished to the parties and they were ordered to show cause on November 8, 1989 why the Plan should not be adopted by the Court.

Plaintiffs filed a variety of objections to the Plan, and asked that I modify it accordingly. Most of the objections related to a failure to provide "timelines" when none were required by statute or regulation and, in the opinion of the experts, were not in the best interest of the Plan. Defendants were essentially satisfied to accept the Plan as proposed, although they considered that it imposed on them obligations that went beyond the requirements of federal statutory and constitutional law. The Plan was discussed among the parties and me at a status conference in chambers, but agreement could not be reached. Subsequently, after conferring with the experts and addressing plaintiffs' objections and defendants' arguments in opposition to plaintiffs' objections, I adopted the Plan.[3]

During status conferences with the experts and Secretary Nelson prior to the hearing and adoption of the Plan, I learned that the Secretary already had obtained from the State additional funds for her department and had begun to implement policies and procedures that were to be included in the Plan. I communicated this fact to counsel during a status conference with them.

In adopting the Plan, I noted, "I am impressed by the dedication of the parties and the experts to the reform of Louisiana's child welfare system. I am also impressed with the significant gains that have been made since the filing of this action. From the beginning, I was convinced that much could be accomplished in a spirit of cooperation. Although the parties did not completely resolve their differences, the essential structure of Louisiana's child welfare system for the foreseeable future has been put into place."[4] In the order adopting the plan, I retained jurisdiction to oversee the Plan's implementation.

Subsequently, defendants filed a motion to amend the January 25, 1990 Order adopting the Plan. Defendants' sole concern was with the court's repetition of the defendants' earlier statement that they "do not object to the Plan as written."[5] Defendants were concerned that the court's repetition of their statement in its order might preclude them, should disputes subsequent-

---

**3.** The Plan is set forth as Appendix A to the January 25, 1990 Order and is attached hereto as well.

**4.** Order, Jan. 25, 1990, at 15–16.

**5.** *See* Order, Jan. 25, 1990, at 6; Defs.' Mem. Supp. Mot. Amend Order.

ly arise, from arguing as they had all along that areas of the Plan exceeded federal requirements. The defendants expressed that they had no intention to appeal the order adopting the Plan.

Plaintiffs then filed their own motion requesting that I alter or amend the order and hold a hearing at which evidence could be introduced in support of explicit findings of fact and conclusions of law. Plaintiffs insisted that there be some mechanism that would enable them to enforce compliance with the Plan through the court's contempt power, despite my constant admonition and the clear statement in the order that the court would retain jurisdiction to oversee implementation of the Plan.

After conference with the parties, I vacated the order adopting the Plan and ordered the action returned to the trial calendar. I wrote: "Based upon these motions, it is obvious that the plan prepared by the parties' experts does not provide a mutually satisfactory resolution to the alleged problems existing in Louisiana's Child Welfare system." [6]

By two amendments to the complaint filed in May and July 1990 eight new plaintiffs were added, bringing their number to 13. Prior to the commencement of the second trial, two plaintiffs were dismissed because they were no longer in State custody.

The second trial began November 19, 1990, and lasted five days. Plaintiffs rested their case. Defendants began to present their case but were unable to complete it because a key defense expert witness was called to active military service in the Persian Gulf war without any prior notice. It was not possible under the circumstances of his mobilization even to take his deposition. A recess was granted to enable the defendants to retain another expert, to afford the expert an opportunity to prepare for trial and to allow plaintiffs to depose him.

Trial was scheduled to resume January 22, 1991. One month prior to this date, plaintiffs filed a motion to compel the production of documents not specifically related to the condition of the named plaintiffs, but asserted to be relevant to whether or not the violations plaintiffs allege are likely to recur. Plaintiffs argued that likelihood to recur would be an appropriate issue for presentation of a rebuttal case after defendants rested. I referred the motion to compel to United States magistrate judge Ronald A. Fonseca, who ordered the documents produced.[7] Defendants then filed a motion to review and set aside the Magistrate Judge's order, which motion I took under advisement until the close of defendants' case.

Upon the request of defendants and the agreement of plaintiffs, the date scheduled for the resumption of trial was continued two months. After defendants' new expert testified, the defendants rested. I ordered the parties to submit memoranda on the issue of whether or not plaintiffs were entitled to present rebuttal evidence. Subsequently, I ruled that plaintiffs' proffered evidence was not rebuttal, and granted defendants' motion to review and set aside the magistrate judge's order compelling the production of the documents. I indicated that reasons for these rulings would be assigned at the time of the decision on plaintiffs' claims.

## I. Asserted Statutory Violations

Plaintiffs allege the existence and violation of a variety of rights which they claim arise from the Adoption Assistance and Child Welfare Act of 1980 (the "Act").

### The Adoption Assistance and Child Welfare Act of 1980

The Act creates a cooperative federal-state child welfare and assistance program. The federal government provides money to States, to assist the States in providing financial assistance, rehabilitation, and oth-

---

**6.** Order, Mar. 22, 1990.

**7.** The Magistrate Judge reasoned, "Although it is unclear at this time whether the information sought would be admissible as part of plaintiffs' rebuttal case, it appears that the evidence might be relevant to rebut defendants' evidence on the issue of mootness." Order, Jan. 17, 1991.

er services to needy dependent children.[8] Participation in the program is voluntary;[9] yet, if a State chooses to participate, it must comply with certain requirements in the Act as well as regulations promulgated by the Secretary of Health and Human Resources. The Act is divided into five parts, A through E. Each part focuses on a different need of dependent children and sets forth criteria to qualify for federal assistance under that part. Plaintiffs allege violations of section 627 in Part B and of section 671 in Part E.

*Part B:* Part B provides federal financial aid to States for establishing and strengthening child welfare services. These services are designed to promote the welfare of disadvantaged children, prevent and remedy child abuse and neglect, prevent family breakups, make appropriate adoptive placements, and provide adequate care for foster children.[10] To be eligible for Part B funds, a State must adopt a plan that meets the requirements of section 622. In addition to these funds, section 627 of Part B provides for incentive funds if a State satisfies additional requirements which focus on the care and administration of foster children.[11] These requirements include conducting an inventory of children in foster care under the supervision of the State, establishing a periodic case review system for each child, establishing a statewide information system that includes the status and goals for foster children, and establishing a service program designed to reunify families or place children in adoptive or other permanent placements.[12]

*Part E:* Part E provides federal aid to States for providing foster care maintenance and adoption assistance.[13] To receive federal aid under Part E, a State must have a plan that provides for reporting child abuse and neglect to law enforcement officials or courts; establishing and applying State standards for foster care homes and institutions; exerting reasonable efforts to prevent the placement of children in foster care and to reunify them with their families; and formulating case plans and implementing a case review system for each child receiving foster care maintenance payments.[14]

Plaintiffs allege the existence and violation of certain statutory rights arising from requirements the Act imposes on a State for receiving federal assistance, in particular, Part B incentive funds and Part E funds. Plaintiffs assert that they have a right (1) to a case plan that tracks the child's placement and receipt of services;[15] (2) to a review of the case plan every six months;[16] (3) to a reliable statewide information system;[17] (4) to reasonable efforts exerted by the State to prevent their placement in foster care and to reunite them with their families;[18] (5) to a plan for achieving a permanent placement;[19] (6) to a placement in the least restrictive and most family-like setting;[20] and (7) to placement in a foster home or institution established and maintained in accord with nationally recognized standards.[21] I find that plaintiffs are not entitled to relief for alleged violations of Parts B and E of the Act because the Act does not create a right enforceable under § 1983. Additionally, the Act does not create a private right of action for enforcing its provisions.

## A. No Enforceable Right Under Section 1983

"Section 1983 provides a cause of action for the 'deprivation of any rights,

---

8. 42 U.S.C. § 601.

9. *See* S.Rep. No. 336, 96th Cong., 2d Sess. 12, 18 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 1448, 1461, 1467.

10. *See* 42 U.S.C. § 625(a)(1).

11. *See id.* § 627.

12. *Id.*

13. *Id.* § 670.

14. *See id.* § 671.

15. *Id.* §§ 627(a)(2)(B), 671(a)(16).

16. *Id.* §§ 627(a)(2)(B), 671(a)(16).

17. *Id.* §§ 627(a)(1), (a)(2)(A).

18. *Id.* § 671(a)(15).

19. *Id.* §§ 671(a)(15), 675(1)(B).

20. *Id.* § 671(a)(16).

21. *Id.* § 671(a)(10).

privileges, or immunities secured by the Constitution and laws' of the United States," including violations of federal statutes.[22] Yet, an individual does not have a cause of action for a violation of a federal statute when the statute does not create an enforceable right within the meaning of section 1983.[23] This is so because " '[s]ection 1983 speaks in terms of *"rights,* privileges and immunities," not violations of federal law.' "[24] Thus, for plaintiffs to have a cause of action for violations of the Act, it must create an enforceable right within the meaning of section 1983.

■ For a statute to create an enforceable right under section 1983, the Congress must have intended for the statute to benefit the putative plaintiffs and the statute must create a binding obligation on the recipient, rather than merely express a congressional preference. In addition, the statute must not be so vague or amorphous to evade enforcement by the courts.[25]

### 1. *Benefit to the putative plaintiffs*

The statutory purpose of the Part B funds is to assist the States to provide child welfare services.[26] To achieve this purpose, Congress appropriates money to the States for funding these services. The Secretary of HHS remits these funds directly to the State. Under certain circumstances, section 627 of Part B provides additional federal funds to a State, known as incentive funds. To qualify for incentive funds, the State must have implemented the additional programs required in that section, prior to the Secretary's allocation to the

States of the Part B funds appropriated for that year.[27] Once a state has qualified for section 627 incentive funds in a given year, discontinuance of the qualifying programs has no consequence during the year. The Secretary cannot withhold funds due or demand return of funds received by the State during that year.

For a State to receive Part E funds, it must satisfy still other specified requirements. The State must submit for approval a plan addressing certain topics to the Secretary[28] and must comply substantially with its plan.[29] If the State meets these requirements, it directly receives and benefits from the federal funds. In part, the State uses these funds to support the services outlined in the plan, such as placing eligible children.[30] A State's failure to adopt a plan and/or substantially comply with the plan results in forfeiture or reduction of the amount of federal funds received.[31]

The services and programs supported by Part B incentive funds and Part E funds do not benefit the putative plaintiffs.[32] The Part B incentive funds serve to provide the mechanism for administering a foster care system. In particular, to receive Part B incentive funds the State must operate "a statewide information system from which the status, demographic characteristics, location, and goals for the placement" of children in foster care can readily be determined.[33] This information system clearly serves only as an administrative tool and is not intended as a benefit to the putative plaintiffs. Thus, plaintiffs have no en-

---

22. *Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 2516–17, 110 L.Ed.2d 455 (1990).

23. *Id.*

24. *Id.* (quoting *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989) (emphasis in original)).

25. *Id.* 110 S.Ct. at 2517.

26. 42 U.S.C. § 620.

27. *Id.* § 627.

28. *Id.* § 671(a).

29. *Id.* § 671(b).

30. The funds are also used to provide foster care maintenance payments and adoption assistance payments. *Id.* § 671(a)(1).

31. *Id.* § 671(b).

32. The Seventh Circuit summarily concluded that the provisions of Part E benefit the children, the putative plaintiffs. *Artist M. v. Johnson,* 917 F.2d 980, 987 (7th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 2008, 114 L.Ed.2d 97 (1991). I do not feel constrained however by this holding because the court arrived at this conclusion without discussion.

33. 42 U.S.C. § 627(a)(2)(A).

forceable right to an information system. Similarly, some of the Part E funds support only administrative procedures, such as services employed in placing the children in the program. While some of these additional programs and services ultimately may benefit the putative plaintiffs, i.e., the foster children, the benefit is indirect. For example, the case plan and review procedures are of particular importance to plaintiffs, yet these procedures simply serve as an oversight mechanism to monitor the child's care and placement while in state custody. The federal funds are not used to feed, clothe, shelter, or satisfy any other need of plaintiffs.

Moreover, these provisions differ from other provisions the Supreme Court has held do benefit the putative plaintiffs in that these foster children do not receive any monetary benefit. For instance, in *Wilder v. Virginia Hospital Association,* the Supreme Court held that the putative plaintiff health care provider, benefits directly from the statutory provision because it provided federal funds to States which in turn passed to the health care provider as reimbursement for services rendered.[34] In other words, the health care provider received a monetary benefit. Likewise, in *Wright v. Roanoke Redevelopment and Housing Authority,* the Supreme Court held that a rent control statute benefits the putative plaintiff tenant.[35] The statute imposed a limit on the amount of rent that the tenant could be charged and required that the rent charged provide a reasonable allowance for utilities. Although the statute directly did not give the tenant money, the tenant did benefit monetarily because the statute reduced her financial expenses.

In contrast, the Part B incentive funds are provided directly to the State and used to support administrative programs. Likewise, the Part E funds are paid directly to the State and used to support programs that place participating children.[36] Additionally, the consequence for failure to comply with the requirements of Part E is simply forfeiture or reduction of the funds.[37] Thus, fulfilling the requirements entitles the State to money. Accordingly, compliance with the provisions found in Part B, § 627, and Part E enures to the benefit of the State, not the putative plaintiffs because the putative plaintiff never receives a monetary benefit. The funds received by the State are used entirely for the administration of the child welfare program and provide no substantive benefits to foster children. The plaintiffs therefore do not have an enforceable right under § 1983 for violations of section 627 in Part B or section 671 in Part E. Nonetheless, for the sake of completeness, I address the remaining factors used to determine whether plaintiffs have an enforceable right within the meaning of section 1983.

### 2. *Obligation v. preference*

For a statute to create a right enforceable under section 1983, it must impose a binding obligation on the state, rather than merely express a congressional preference.

The incentive funds available pursuant to section 627 of Part B are available to the State whether or not the State complies with the requirements in this section. In other words, the Secretary of HHS does

---

**34.** — U.S. —, 110 S.Ct. 2510, 2516–17, 110 L.Ed.2d 455 (1990).

**35.** 479 U.S. 418, 430, 107 S.Ct. 766, 774, 93 L.Ed.2d 781 (1987).

**36.** Part E funds also support foster care maintenance payments and adoption assistance payments. 42 U.S.C. § 671(a)(1). The payments are made to the individuals or institutions caring for the child. *Id.* § 675(3)–(4). This aspect of the Part E funding provision parallels the provision addressed in *Wilder v. Virginia Hosp. Ass'n,* — U.S. —, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). Both provisions require the state to

disburse the funds directly to the putative plaintiff, or in the case of the children, to an individual or entity on behalf of the child. In light of the *Wilder* Court's holding that the funding statute benefits the putative plaintiff, the Part E provisions pertaining to these payments probably benefits the putative plaintiffs. Yet, in *Wilder* the putative plaintiff expressly challenged the amount of funds it had received from the state. The children have not alleged a violation of any provision relating to these payments. Accordingly, the payment provisions are not at issue and the *Wilder* holding does not apply.

**37.** 42 U.S.C. §§ 627(b), 671(b).

not have authority to withhold funds if, after qualifying for the funds in a given year, a State discontinues the required programs or fails to satisfactorily maintain the required programs during the year for which the funds are authorized. This section of the Act parallels the section of the funding statute at issue in *Pennhurst State School & Hospital v. Halderman.*[38] The Court held that, if the Secretary cannot terminate the funds for a State's failure to comply with the section at issue, Congress must have intended for the provisions of that section to be horatory, not mandatory.[39] Under this reasoning, the requirements of Part B, section 627, must simply express a congressional preference, rather than impose an obligation on the State.[40] Accordingly, the plaintiffs have no enforceable right under § 1983 for violations of section 627 of Part B.

To receive the Part E funds, the State must satisfy its requirements. The statutory language is mandatory. Therefore, the Part E requirements do impose a binding obligation on the State.[41] Although Part E of the Act satisfies this prong of the analysis, it does not benefit the putative plaintiffs, thus foreclosing a right of action pursuant to section 1983.

### 3. *Vagueness*

To find that a statute creates an enforceable right within the meaning of section 1983, the statute must not be so vague or amorphous to evade enforcement by the courts. After carefully examining each provision allegedly violated, I find that it is so vague as to evade enforcement by the courts.

### a. *Reasonable efforts*

■ Plaintiffs assert that they have a right to have the State employ reasonable efforts to prevent placement in foster care and reunite children with their families, pursuant to section 671(a)(15). This section provides, "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which ... provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home."

The Seventh Circuit, in *Artist M.*, held that this provision was sufficiently explicit for judicial enforcement.[42] The court concluded that, although the State had considerable discretion in choosing the method to satisfy this requirement, the courts were capable of evaluating whether the method chosen constituted a reasonable effort. The court relied on the district judge's reasoning and the Supreme Court's decision in *Wilder v. Virginia Hospital Association,* —— U.S. ——, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).[43] I find this reliance unwarranted.

The district judge in *Artist M.*, reasoned that, because courts routinely enforce contractual clauses which require a party to use "reasonable" efforts to comply with the terms of the agreement, the court was capable of enforcing the reasonable efforts provision in Part E.[44] I find this reasoning unsound. In contract actions, the party seeking a determination of whether reasonable efforts have been exerted, without question has a right of action. As such,

---

**38.** 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981).

**39.** *Id.* at 24, 101 S.Ct. at 1543.

**40.** *See Spielman v. Hildebrand*, 873 F.2d 1377, 1386 (10th Cir.1989) ("[A congressional] mandate is questionable under AACWA, which was enacted to 'provide the states with fiscal incentives to encourage a more active and systematic monitoring of children in the foster care system.'" (quoting *Vermont Dep't of Social & Rehabilitation Servs. v. United States Dep't of*

*Health & Human Servs.,* 798 F.2d 57, 59 (2d Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987))).

**41.** *See also Artist M. v. Johnson,* 917 F.2d 980, 987 (7th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 2008, 114 L.Ed.2d 97 (1991).

**42.** *Id.* at 987.

**43.** *Id.*

**44.** *Id.*

the court *must* decide the parties' rights, even if defined only by subjective or non-quantifiable standards, such as good faith or reasonable efforts. In contrast, in a private right of action, the court does not assume that a right of action exists. Rather, the court first must determine whether Congress intended for the statute to be privately enforceable. In so doing, the court examines the degree to which the statute provides an objective benchmark for measuring compliance.[45] Thus, unlike contract actions, a court is not bound to enforce every statute regardless of its specificity. A court is only so bound when Congress expressly creates a private right of action.

The Seventh Circuit also relied on the Supreme Court's holding in *Wilder*, however, *Wilder* is inapposite. In *Wilder*, the plaintiff health care provider challenged the reasonableness of the rate at which health care providers were compensated for rendering medical services to Medicaid patients. The State established this rate pursuant to a condition of its federal funding, which obligated the State to adopt "reasonable and adequate" reimbursement rates. The funding statute mandated that the reimbursement rate meet the costs of operating an efficient and economical health care facility. Because the statute provided an objective benchmark for measuring the reasonableness of the reimbursement rate, the Court rejected the State's vagueness challenge.[46] The *Wilder* Court relied significantly on *Wright v. City of Roanoke Redevelopment & Housing Authority*.[47] In *Wright*, the plaintiff tenant challenged the reasonableness of the utilities charged to occupants of rent controlled housing. Again, the court rejected the State's vagueness challenge.

Unlike *Wilder* and *Wright*, the "reasonable efforts" provision in this Act does not provide an objective benchmark for determining reasonableness. To assess the reasonableness of the health care providers' reimbursement, a court need only compare the rate of reimbursement to customary charges of medical facilities for the same or similar treatment. Similarly, determining the reasonableness of the utility allowance requires simply comparing the utility charged to local utility rates.[48] Indeed a court is competent to determine the reasonableness of such quantitative measure. But "reasonable efforts" cannot be reduced to a quantitative measure. In light of this significant distinction, the *Wilder* Court could not have categorically rejected the argument that "reasonable" is vague and unenforceable.

> What *Wilder* actually says, however, is that a standard like reasonableness is not vague or unenforceable when judged "against an objective benchmark of an 'efficiently and economically operated facility'...." Similarly in *Wright*, the Court felt competent to enforce the "reasonable" allowance standard only with reference to the objective benchmark of "the individual family and its income." Both "benchmarks" provide a basis for a relatively simple judicial calculation. But in the present case, the [Act] provides no such objective benchmark. Rather, the Act gives a general directive that is much too broad to give a federal judge a proper gauge from which to measure reasonable efforts.[49]

For these reasons, I find that the "reasonable efforts" provision is vague and unenforceable.

#### b. Case plan and reviews

■ Plaintiffs assert that they have a right to case plans that address specific issues in their placements and care and to have these plans formulated within sixty days after entering state custody, pursuant

45. *See, e.g., Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 2523, 110 L.Ed.2d 455 (1990).

46. *Id.* 110 S.Ct. at 2522–23.

47. 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987).

48. *Artist M. v. Johnson,* 917 F.2d 980, 993–94 (7th Cir.1990) (Manion, J., dissenting), *cert. granted,* —— U.S. ——, 111 S.Ct. 2008, 114 L.Ed.2d 97 (1991).

49. *Id.* at 994 (Manion, J., dissenting).

to 42 U.S.C. §§ 627(a)(2)(B) and 671(a)(16).[50] The contents of the case plan and the case review procedure are adequately delineated in section 675. Yet, it is not the plan itself that plaintiffs seek; it is the successful implementation of the contents of the plans. Specifically, the case plan must contain a plan for assuring that the child receives proper care, a plan to facilitate the permanent placement of the child,[51] and a plan "designed to achieve placement in the least restrictive (most family like) setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." [52] Plaintiffs specifically assert a right to these goals.

The First and Fourth Circuits have summarily concluded that foster children have an enforceable right within the meaning of section 1983 to case plans and reviews. The courts reached this conclusion prior to the Supreme Court's *Wilder* decision in which the Court explicitly set forth the three part analysis for determining whether a statute creates an enforceable right. These courts did not follow the *Wilder* analysis which I have applied. Accordingly, I do not find the First and Fourth Circuits decisions persuasive and proceed to consider whether these statutory provisions are capable of judicial enforcement.

In holding that a given federal statute is judicially enforceable, the Supreme Court has relied upon the availability of an objective benchmark against which the court can measure compliance with the statute.[53] For instance, in *Wilder*, the petitioners challenged the enforceability of a statute that required States to adopt "reasonable rates" on grounds of vagueness. The Su-

preme Court rejected their argument because "the statute and regulation set out factors which a State must consider in adopting its rates. In addition, the statute requires the State, in making its findings, to judge the reasonableness of its rates against the objective benchmark of an 'efficiently and economically operated facility....' " [54]

Unlike the statute in *Wilder*, the statutory provisions relating to the case plans and case reviews do not provide an objective benchmark against which compliance can be measured. Rather, case plan and case review requirements are couched in broad, goal-oriented terms. The statutory definition of case plan refers to "proper care," "facilitating return of the child to his home or the permanent placement of the child," and "discuss[ing] the appropriateness of the services that have been provided to the child." Likewise, the regulations speak in broad terms, such as "the best interest and special needs of the child." [55] There is no objective benchmark against which compliance with this provision can be measured. Whether a child has a plan satisfying this provision is as individual as each child. Unlike *Wilder*, where the efficiently operated facility functioned as the norm against which compliance could be measured, there is no way to measure the normal or average needs of a child in foster care. Accordingly, I find that the provisions requiring a case plan and case review system are so vague and amorphous as to evade judicial enforcement.

#### c. *Foster homes and institutions*

■ Plaintiffs assert a right to be placed in foster homes and institutions established

---

**50.** Section 627(a)(2)(B) provides that for a State to receive Part B incentive funds, the State must have "implemented and [be] operating to the satisfaction of the Secretary a case review system (as defined in section 675(5) of this title) for each child receiving foster care under the supervision of the State." Section 671(a)(16) provides that the State "shall have a plan approved by the Secretary which provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meet [sic] the requirements described in

section 675(5)(B) of this title with respect to such child."

**51.** 42 U.S.C. § 675(1)(B).

**52.** *Id.* § 675(5)(A).

**53.** *Wilder v. Virginia Hosp. Ass'n*, — U.S. —, 110 S.Ct. 2510, 2522–23, 110 L.Ed.2d 455 (1990).

**54.** *Id.* 110 S.Ct. at 2522.

**55.** 45 C.F.R. § 1356.21(d); *id.* § 1357.15(e).

and maintained in accord with nationally recognized standards pursuant to section 671(a)(10).[56] Specifically, the statute requires that the foster homes and institutions be "reasonably in accord with recommended [national] standards." The language "reasonably in accord with" compares with the "reasonable efforts" language addressed previously. I adopt my reasoning used in addressing whether the "reasonable efforts" language was capable of judicial enforcement. Accordingly, I find that this provision requiring placement in foster homes and institutions that are "reasonably in accord with" national standards is vague and unenforceable.

### B. No Implied Private Right of Action

■ Having foreclosed any right of action within the meaning of section 1983, I also must consider whether the statute itself creates an implied private right of action in favor of plaintiffs, because an implied right of action represents another avenue in which plaintiffs could seek relief for violations of the Act.

■ Determining whether a statute creates an implied right of action is similar to determining whether a statute creates an enforceable right under section 1983 in that both inquiries require an examination of congressional intent.[57] Yet, the plaintiff carries an even heavier burden in claiming an implied private right. For a federal statute to create an implied private right of action, Congress must have affirmatively contemplated private enforcement when it passed the statute.[58] Thus, "[i]n determin-

ing whether a federal statute that does not expressly provide for a particular private right of action nonetheless implicitly created that right, [the court's] task is one of statutory construction. The ultimate question ... is whether Congress intended to create the private remedy ... that the plaintiff[s] seek[ ] to invoke."[59]

The Supreme Court has set forth the relevant factors in determining whether a federal statute created an implied right of action. The court should consider whether Congress enacted the statute for the "especial" benefit of a class to which plaintiff is a member.[60] Moreover, the court should consider "the language of the statute itself, its legislative history, the underlying purpose and structure of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies."[61]

The first factor asks whether Congress enacted the statute for the "especial" benefit of the class to which plaintiffs are members. This inquiry overlaps my earlier discussion on whether Congress intended for the statute to benefit the putative plaintiff. Accordingly, it is not necessary to explore the issue again. I adopt my earlier finding that Congress did not intend for the statute to benefit the plaintiffs.

The language of the statute in no way contemplates private enforcement of the Act. Moreover, the legislative history makes no mention of whether the Act creates a private right of action for violations

---

**56.** 42 U.S.C. § 671(a)(10) requires a State to have a plan that

provides for the establishment or designation of a State authority or authorities which shall be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, and provides that the standards so established shall be applied by the State to any foster family home or child care institution receiving funds under this part or part B of this subchapter.

**57.** *Victorian v. Miller,* 813 F.2d 718, 721 (5th Cir.1987).

**58.** *Id.*

**59.** *Northwest Airlines v. Transp. Workers Union,* 451 U.S. 77, 91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981) (citations omitted).

**60.** *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975).

**61.** *Northwest Airlines,* 451 U.S. at 91, 101 S.Ct. at 1580.

of sections 627 and 671.[62] Rather, the legislative history repeatedly suggests that Congress intended for the Secretary of Health, Education and Welfare to monitor and oversee the plans submitted by the States and to report his or her findings back to Congress.[63] Thereby, Congress vested itself with the ability to ensure compliance with these provisions through its power over the appropriations made to the States. Thus, congressional intent to create a private right of action cannot be inferred from the language of the statute or its legislative history. Accordingly, the essential predicate for implying a private remedy is absent.

In addition, the Supreme Court has held that when a "statute by its terms grants no private rights to any identifiable class and proscribes no conduct as unlawful," Congress did not intend, either expressly or by implication, to create a private right of action.[64] This holding applies here. The Act does not create any private rights to any identifiable class. Additionally, the Act proscribes no conduct as unlawful. Rather, the Act encourages States to implement certain plans. Indeed, failure to comply with the Act's requirements is not unlawful; it simply affects the States' receipt of federal funding. Accordingly, I find that the Act creates no implied private right of action.

### C. Child Abuse Prevention Act

■ Finally, plaintiffs contend that they have an enforceable right to prompt and accurate investigations of allegations of abuse and neglect. They allege this right arises from a conjunction of requirements in two separate statutes, the Child Welfare Act and the Child Abuse Prevention and Treatment Act (the "Child Abuse Prevention Act").[65]

Plaintiffs point to several obligations imposed on States to qualify for federal grants for child abuse prevention and treatment programs. In particular, they claim that a State is required to "provide that upon receipt of a report of known or suspected instances of child abuse or neglect an investigation shall be initiated promptly to substantiate the accuracy of the report...."[66] The Child Abuse Prevention Act further requires that, "[p]rograms or projects relating to child abuse and neglect assisted under part B of the title IV of the Social Security Act [42 U.S.C.A. § 620 et seq.] shall comply with the requirements set forth in paragraphs (1)(A), (2), (4), (5), and (10) of subsection (b) of this section."[67] There is no evidence to establish that the State received funds under the Child Abuse Prevention Act or that State programs or projects relating to child abuse and neglect were assisted with Part B funds. Because receipt of federal funds is essential to create a legal obligation to investigate and because plaintiffs' offered no evidence of failures to report under 42 U.S.C. § 671(a)(9), they have failed to establish an enforceable right.

### D. Alternative Findings of Fact

■ Even assuming, however, that a right of action does exist, I find that the State did not violate the Act.

The Office of Community Services ("OCS") is the branch of the Louisiana Department of Social Services ("DSS") responsible for child welfare services, including foster care. Each plaintiff has a case manager responsible for his or her plan and the delivery of services to the child. Most of the plaintiffs have had more than one case worker while in State custody. However, since 1982 each plaintiff has had an assigned case worker.

---

**62.** S.Rep. No. 336, 96th Cong., 2d Sess. 1–57 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 1448–1506.

**63.** *Id.* at 13, 17, 18, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 1462, 1466–67.

**64.** *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979).

**65.** 42 U.S.C. §§ 5101 *et seq.*.

**66.** *Id.* § 5106a(b)(2).

**67.** *Id.* § 5106a(e).

Louisiana submitted plans to HHS under Parts B and E of the Child Welfare Act of 1980 in order to qualify for federal funds for its child welfare services and foster care programs. The plans had the proposed effective date of October 1, 1982, the beginning of federal fiscal year 1983, and the funds were received on that date. In December 1982 or January 1983, the State certified to HHS that it was operating the programs required by the Child Welfare Act of 1980 in order for it to receive Part B incentive funds. This certification was effective October 1, 1982. Louisiana first received Part E and Part B incentive funds in fiscal year 1983. The State was required to return its Part B incentive funds for fiscal year 1983 after a federal audit found the State was not in compliance with the requirements for receiving the additional funds. There was no evidence to establish that Louisiana ever received additional funds under the Child Abuse Prevention Act or ever applied its Part B funds to child abuse and neglect programs.

Plaintiffs stipulated that in the absence of testimony relating to a topic that they assert must have been discussed in a case plan or at a case review, that topic had been addressed adequately.

The ten plaintiffs who contested the adequacy of their case plans failed to show that they had received foster care maintenance payments under Part E.

 Plaintiffs' experts, Dr. Hunzeker, and Dr. Lynn Perlmutter, an assistant professor of social work at Tulane University,[68] gauged the State system by whether there was absolute compliance with the Child Welfare Act's case plan and case review requirements. However, based upon the expert testimony of Mr. Robert McKeagney, former deputy commissioner of the Maine Department of Human Services and currently the senior public agency

consultant at the Child Welfare League of America, I find the standard for determining whether the defendants have met their obligation under the Act to be substantial compliance.[69] The Act requires the State to make reasonably timely and thorough review of each foster child's case plan and needs. Compliance with this standard is capable of judicial determination. Accordingly, I address each plaintiff's situation to determine whether there was substantial compliance with the Act.

### Del and Brendolyn A.

Brendolyn A. was born in October 1978. Her brother Del A. was born August 1, 1981. Del and Brendolyn were brought into State custody[70] in September 1981 because of suspected abuse.

Del has had seven foster care placements. Three placements were in institutions for a total of about 2 years, and the rest of the time he has spent in four foster homes. Del's mother's parental rights were terminated in 1989.

Del's mother's interest in and capacity to care for her children diminished. In response DHHR and DSS, as well as the State courts changed Del's plan's goals from attempting to reunite Del with his mother to termination of the mother's rights and adoption. Both Dr. Hunzeker and Mr. McKeagney agreed that the State should have set a firm goal of adoption sooner than it did. However, both considered that this required a difficult exercise of professional judgment, which judgment should be given deference.

Dr. Hunzeker testified that, based on the case records, Del received too few medical and dental examinations while in State custody. Dr. Hunzeker's conclusion that Del did not receive adequate medical or dental care was measured against a standard of "proper care" not required by the Act.

---

**68.** Dr. Perlmutter had never worked for a public child welfare agency.

**69.** 42 U.S.C. § 671(b) expressly refers to substantial compliance.

**70.** An "instanter," or immediate, judicial order is required for the State of Louisiana to take

custody of a child. This is followed by a "72 hour hearing." Within 30 days, the district attorney may, in his discretion, file a petition alleging a child in need of care. The subsequent adjudication of this petition determines whether a child is to remain in State custody indefinitely.

However, in considering the minimum care required by the Act and the Constitution, there is no evidence that Del did not receive medical or dental care that he needed.

Brendolyn has had eight foster care placements. She has spent four and a half years in four institutional placements. In September 1986, Brendolyn was placed in Bethlehem Children's Home, where she remains today.

A parent in Brendolyn's third foster home used excessive discipline. A statement in the record revealed that one social worker, after placing the child in the foster home, knew about the excessive discipline for eight months but did nothing.

While the record does not show a medical or dental examination for each year Brendolyn was in State custody, there is no evidence that any of her medical or dental needs were not met.

The case plans for Del and Brendolyn were developed together for some time because they were brother and sister. Dr. Hunzeker testified and I find that this was appropriate. Del and Brendolyn's case plan first was developed on January 28, 1983. Del has had eleven administrative and at least seven judicial reviews since October 1, 1983. Brendolyn has had ten administrative reviews and nine judicial reviews during the same time. No administrative or judicial reviews of Del or Brendolyn's case occurred between November 1983 and November 1984, November 1985 and May 1986, and October 20, 1987 and August 25, 1988. Nevertheless, I find that the case plan was reviewed sufficiently.

Dr. Hunzeker was critical of Del and Brendolyn's plan as it emerged from reviews in 1985 and 1986 for holding out the possibility of two goals. One goal was reunification with their mother and a secondary goal was adoption. However, Mr. McKeagney testified and I find that it was not professionally unacceptable to hold out two goals that are mutually contradictory in the long-term if it is questionable whether the primary goal can be achieved.

Dr. Hunzeker opined that Del and Brendolyn were victims of foster care drift. That term refers to children still in the foster care system after many years because permanent goals were not established, maintained and carried out. However, Mr. McKeagney considered and I find that Del and Brendolyn's case plan and case reviews involved a timely and thorough assessment of their needs that substantially complied with the Act.

### Chris B.

Chris B. is seventeen years old. He entered State custody in August 1979. Although Chris' parents are unable to care for him, they have expressed some continued interest in him. They have been unwilling to surrender their parental rights.

Chris has had eight placements in his eleven years in State custody. Chris has been identified throughout this period as having emotional problems and being severely retarded.

In December 1988, there were allegations that the foster father often drank and drove, and that on one occasion he slept in Chris' bed allegedly to control Chris after Chris had lost control of his behavior. There was also an allegation that Chris had been physically abused. These complaints were investigated by the State and found valid. State social workers met with the family, and a corrective action plan was agreed upon between the agency and the foster parents delineating the improvements and changes that were necessary. However, although the foster parents refused to sign the corrective action plan, Chris remained in the home. Subsequently, another allegation of abuse was verified and Chris was placed in G.B. Cooley, a specialized institution for disturbed or retarded individuals in Monroe, Louisiana, where he currently resides. Plaintiffs have not proved by a preponderance of the evidence that the decision to allow Chris to remain in the foster home temporarily did not involve an exercise of minimally acceptable professional judgment. Therefore, I find such judgment should be given deference.

Chris' case plan was first developed on September 1, 1983 and the plan has had twenty-five judicial reviews since then.

However, the only administrative reviews of his case took place in November 1984, July 1987, and June 1988. A number of "team conferences" were held in the interim, but defendants did not contend that these satisfied the Child Welfare Act's standards. Mr. McKeagney was critical of the failure to establish a timely administrative review process until June 1988. However, he considered and I find that there had been a reasonable identification of Chris' needs over this time.

Beginning in June 1988, administrative reviews occurred every six months. Several reviews were critical of Chris' case plan for not addressing either the appropriateness of placement or how court-ordered services were to be carried out. Chris' final administrative review was conducted on July 19, 1990. The plan as it emerged from this review was determined by both the review panel and Dr. Hunzeker to be adequate.

Dr. Hunzeker considered Chris to be a victim of foster care drift. She felt that there had been insufficient efforts made to terminate parental rights, thus enabling adoption. Dr. Hunzeker also was critical of Chris' long-term plan goal of foster care as opposed to adoption or reunion with his natural parents. However, she conceded and I find that long-term foster care is an acceptable goal within the child welfare profession, especially when, as Mr. McKeagney testified and I find, adoption was highly improbable for Chris due to his severe retardation. Therefore, I find there was substantial compliance with the Act.

### Stephanie C.

Stephanie C. was born August 18, 1974. She has been in State custody since June 1981.

Stephanie has behavioral problems and is borderline mentally retarded. Both her natural parents suffered from emotional problems that left them unable to care adequately for their children. Stephanie has had five placements since coming into State custody, twice with her sister Stacey.[71] Stephanie's difficult behavior has caused several of these placements to disrupt.

After Stephanie was taken into State custody an allegation was made and credited that Stephanie had been sexually abused by her mother's boyfriend while she still lived with her mother. The State identified Stephanie as needing psychiatric treatment, but she did not receive it during at least her first three years in State custody. Once placed at the MacDonnell Home in 1984 she was in a therapeutic program that gave some attention to her needs arising from the suspected sexual abuse.

Stephanie's case plan first was developed on December 18, 1981. Since that time, Stephanie has had twelve administrative and ten judicial reviews. No administrative or judicial review occurred between April 3, 1986 and March 25, 1987.

Dr. Hunzeker criticized various aspects of Stephanie's case plans over the years, but no pattern emerged that the State ignored an issue over a sustained period of time. Dr. Hunzeker considered and I find that Stephanie's six administrative reviews since April 1988, and the case plans that emerged from them, were timely and adequate. Therefore, I find that Stephanie received a reasonably thorough periodic assessment of her needs that substantially complied with the Act.

### Leroy E.

Leroy E. was born December 12, 1976 and became known to the State in 1981 after he set fire to his house and had been abandoned by his mother. He was identified as a victim of neglect and was placed in his grandmother's home. In September 1983 the grandmother requested that the State take Leroy because he had cut his sister with a knife, run away, and stolen $500 from the grandmother.

Leroy has substantial behavioral problems. He likes to set fire to things and on one occasion set fire to his foster father. Five of his seven years in State custody have been spent in institutions. He has had seven placements, and now resides at Bethlehem Children's Home.

---

71. Stacey was an original plaintiff in this action, but was adopted subsequently.

Leroy was evaluated in July 1981 as needing a psychological evaluation but this did not occur until May 1983.

Dr. Hunzeker faulted Leroy's case plans and reviews for not working toward achieving a less restrictive placement than an institutional setting. She also faulted his plan's goal being long-term foster care rather than adoption. The State had come to consider Leroy unadoptable. On September 7, 1988, a State juvenile court determined that Leroy was not adoptable and ordered that a voluntary surrender of custody by Leroy's mother was not to be sought or accepted.

Leroy's case plan first was developed on October 4, 1983. He has had fourteen judicial and fifteen administrative reviews since then. He had no judicial or administrative review between January 15 and August 1, 1985. The administrative reviews between January 1985 and February 1989 showed a pattern of failing to assess the extent of compliance with the case plan as it emerged from the prior review. However, Dr. Hunzeker considered his administrative reviews and case plans since August 1, 1989 to be adequate. I find that Leroy has had a reasonably timely and thorough periodic assessment of his needs. Therefore, there has been substantial compliance with the Act.

### Flemming G.

Flemming G. came into State custody in 1978, when he was six months old, after his mother abandoned him.

Flemming has had twenty-four placements in his twelve years in State custody. These have included foster homes, specialized foster homes, group homes of six to eight children, institutional settings, and a number of placements that were temporary by design. Flemming has several times been placed in pre-adoptive homes, but each of them has disrupted. Flemming has been determined by a State court judge to be unadoptable.

Flemming was identified as needing psychiatric treatment in August 1982, but did not receive it until May 1983. A year later the therapeutic relationship was broken, against the advice of the therapist, to facilitate a foster home placement. Throughout the record, the State and the State courts identified Flemming's single overriding need to be a stable, lasting placement. Flemming began running away in 1988 and he has run away four times since. At the time of trial he had been a runaway since July 1990.

Flemming's case plan first was developed in March 1983. An administrative review occurred a year later, and then not again until February 2, 1989. There were seven intervening judicial reviews and five intervening team conferences. Mr. McKeagney considered and I find that during this period the DHHR deviated significantly from legal and professional standards for a case plan and case review system for Flemming. However, since February 2, 1989, Flemming's administrative reviews have been timely and generally comprehensive, and have been in substantial compliance with the Act.

### Keithrell K.

Keithrell K. was born September 3, 1988. Keithrell was taken into custody after her mother left her with two acquaintances, who took the baby to another friend, who took Keithrell to the police. The police contacted OCS and on February 16, 1989 Keithrell was taken into State custody.[72]

Keithrell was placed in a foster home, where she remains today. Her case plan was developed on March 15, 1989. Her plan was administratively reviewed on July 18, 1989 and her goal was identified to be adoption. A petition for termination of parental rights was not filed until May 1990, after Keithrell was named a plaintiff in this action. Keithrell has begun to bond with her foster mother and the foster parents have expressed a willingness to adopt her. I find that Keithrell has had a reasonably timely and thorough periodic assessment of

---

**72.** Plaintiffs sought to prove that no steps were taken at this point to protect Keithrell's mother. She, however, was not a plaintiff.

her needs that has complied substantially with the Act.

### James and Clinton L.

James and Clinton L. are fraternal twins who were born on January 6, 1980. They entered State custody in May 1983, and have been placed together throughout their lives.

Their natural mother has drug and alcohol problems and was at one time diagnosed as schizophrenic. The mother has continued to visit her children and has gone through extensive parent counseling and therapy. Some doctors are of the opinion that she remains too mentally ill to parent her children; others disagree. Since 1984, the plan's goal has been adoption. Judicial orders from January 1986 to February 1987 precluded the State from seeking termination of their parents' rights. A judge then ordered the State to file a termination petition. The State mistakenly filed a petition to terminate the mother's rights based on abandonment rather than unfitness.[73] Therefore, termination of parental rights was granted only as to the father. After the State filed a second petition to terminate the mother's rights, now based upon her alleged unfitness, a different juvenile court ordered the State to desist from its efforts to terminate the mother's rights. Finally, in June 1990 another termination petition had been filed against the mother that was being adjudicated at the time of trial.

The boys' first case plan was developed on June 14, 1983. In the mid-1980's, Clinton's case plan failed to discuss his growing mental health problems. Clinton was identified as needing psychotherapy in March 1985, but did not receive even the preparatory evaluation until July 1986.

James and Clinton did not receive a dispositional court hearing until July 1986.

Dr. Perlmutter considered the boys to be victims of inadequate case planning and foster care drift. However, Mr. McKeagney considered that the natural mother's continued contact with but inability to take custody of her children presented the State with a difficult judgment call. He also considered that court orders precluding termination of the mothers' rights were the primary impediment to the adoption of the boys. Finally, he considered that their case review systems had been timely and adequate. I agree and find that there has been substantial compliance with the Act.

### Charlotte O.

Charlotte O. was born on October 11, 1987 and she entered State custody on November 22, 1989.

The incident that led to the State taking custody of Charlotte was a fall from a window or stairs that led to a hairline skull fracture. The doctor at the hospital saw Charlotte's mother slapping her, yelling at her and eating food off of her plate, and noted that the child hid when the mother came into the room. The doctor called the OCS and advised that the child not be allowed to return to her mother. She then was taken into State custody.

Charlotte was placed initially in Charity Hospital and then moved to a foster home, where she remains today.

Charlotte's permanent plan always has been reunification with her mother. Mr. McKeagney was of the opinion that Charlotte's case review system was timely and complete and there was no substantial evidence to the contrary. Therefore, I find there was substantial compliance with the Act.

### Dani M.

Dani M. is seventeen years old and lives with her foster parent, Mrs. E, her former sixth grade teacher. Dani has resided with Mrs. E. for two years.

Dani's mother was physically and mentally abusive to her and abandoned her forty to sixty times, for periods of a few days to a few weeks. In June 1988, Dani began to live with Mrs. E. under an informal adjustment agreement approved by a

---

**73.** Petitions for an adjudication by a Louisiana court with juvenile jurisdiction of a child or parent's status are filed by the district attorney in consultation with the State child welfare agency.

State court. Dani entered State custody on March 17, 1989.

Dani's case plan first was developed in May 1989. It set a goal of reuniting Dani with her mother, even though Dani did not want to be reunited and the mother's whereabouts were unknown. Dani's plan goal later was switched to adoption. Mrs. E. has received foster care maintenance payments from the State. Mrs. E. wishes to adopt Dani, but Dani is unsure whether or not she wishes to be adopted. Dani explained that she wants to take time to decide because it is the first time in her life she has had control over her future.

Plaintiffs' experts did not testify about the adequacy of Dani's case plans or case review system. I find that Dani has received a reasonably timely and thorough periodic assessment of her needs that substantially complied with the Act.

### Special Treatment

Ms. Ann Joseph was the OCS "program specialist" for the plaintiffs over the year or so prior to the second trial. She was known as the "Del A." coordinator, and handled requests for services for the plaintiffs. Throughout OCS, program specialists are responsible for approving requests for services. All plaintiffs were assigned to a single program specialist so that data could be collected on their cases for use in this litigation. She testified that in 1986 the State child welfare agency had made a conscious decision not to treat the plaintiffs in this action differently from other foster children.

Assistant Secretary Kelley testified that in early to mid–1990 she authorized a reduction in the case loads of the various OCS case workers who were assigned to the plaintiffs. She explained that it had been brought to her attention that the case workers for the plaintiffs had been having difficulty both managing their regular activities and complying with the documentary and other requests from attorneys and expert witnesses on both sides of this litigation.

Anne St. Pierre, Del's current and Flemming's former adoption specialist at OCS, testified that she was instructed to make copies of everything done in the case, and to forward to a DSS attorney copies of everything that went into Del's case record. Ms. St. Pierre testified that she received no instruction to and did not consciously treat Del differently in the level of her social work practice than her other assigned foster children. Ms. St. Pierre testified that she was supposed to have received a reduction in her caseload by five children to enable her to process the extra paperwork created to defend this lawsuit, but she did not receive such a reduction.

Ms. Sharon Worthy, the case manager at OCS for both Leroy and the mother of James and Clinton L., testified that as a result of these two assignments her case load was about half that of the other case workers in her unit, except for another case worker who also was assigned to a plaintiff involved in this lawsuit. She testified that she received instructions pertaining to preparing for this litigation, but no instruction to provide a higher standard of care. She testified that in preparing for this litigation she had to do a lot of work that she normally would not have to do. She testified that she consciously had not given preferential treatment to Leroy over her other assigned children.

In several cases, there was a tendency for important or long-awaited steps to have been taken in the half year prior to the second trial. A few cases actually saw a decrease in activity. I accept the bona fides of the OCS workers, who were plaintiffs' witnesses, and that of their director, Ms. Kelley, that there was no conscious attempt to provide a standard of care that was higher for the plaintiffs than for other children in State custody.

### II. *Asserted Constitutional Violations*

Plaintiffs also allege the existence and violation of certain substantive constitutional rights. Specifically, plaintiffs assert that they have a right to 1) reasonable physical safety, 2) emotional and psychological safety, and 3) placement in a least restrictive setting. In addition, plaintiffs assert violations of their procedural due process rights.

As a general matter, a State is under no constitutional duty to provide substantive services for those within its borders.[74] However, when a person is in custody of the State, or a "special relationship" exists between a person and the State, the State has a duty to provide certain services and care. Even when a State has a duty, it necessarily has considerable discretion in determining the nature and scope of its responsibilities. In any case, the State must satisfy the custodial individual's basic needs and constitutionally protected liberty interests. Section 1983 creates a cause of action for deprivations of these due process liberty interests. To state a cause of action for violation of the Due Process Clause under Section 1983, the plaintiffs must assert a recognized liberty or property interest within the purview of the Fourteenth Amendment to the United States Constitution of which they were recklessly or intentionally deprived by a person under color of law.[75] It is well settled that only a limited range of interests fall within this provision,[76] and courts must resist the temptation to augment the substantive reach of the Fourteenth Amendment.[77]

### A. Reasonable Physical Safety

Because the State has established a custodial relationship with plaintiffs, they have a right to adequate food, shelter, clothing, and medical care. In addition, plaintiffs have a right to freedom from bodily restraint and any training necessary to ensure their safety and to facilitate their ability to function free from bodily restraints.[78] This responsibility begins once a child is removed to State custody and remains even after the child is placed in a foster setting. Upon placement in foster care, the state's responsibility changes; the foster parent is deemed a "state instrument" only if the State places the child in a setting it knows or should have known was unsafe.[79] Outside of this narrow case, foster parents are not agents of the State. This reasoning is sound because certainly if the state decided to return a child whom it had taken into custody to the child's natural parents, those parents would not become state agents. And if the state awarded custody to one parent who later beats the child, that parent would not be a state agent whose actions would impose liability on the state.

There is no clearly established right to a stable foster home environment.[80] In addition, there is no requirement that the State justify conditions of less than absolute safety.[81] Such a requirement would place an undue burden on the administration of programs and would restrict the exercise of professional judgment. Liability is imposed only when a decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the professional actually did not base the decision on such a judgment.[82] Plaintiffs failed to show a substantial departure from accepted professional judgment. In addition, I find that the Constitutional requirements of reasonable physical safety were met by the State.

### B. Emotional and Psychological Safety

The Seventh Circuit, in *K.H. Through Murphy v. Morgan*, recognized a

---

**74.** *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982).

**75.** *Griffith v. Johnston,* 899 F.2d 1427, 1435 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

**76.** *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983).

**77.** *Griffith,* 899 F.2d at 1435.

**78.** *Youngberg,* 457 U.S. at 307, 102 S.Ct. at 2452 (1982).

**79.** *K.H. Through Murphy v. Morgan,* 914 F.2d 846 (7th Cir.1990).

**80.** *Drummond v. Fulton County Dept.,* 563 F.2d 1200, 1209 (5th Cir.1977), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978); *K.H. Through Murphy,* 914 F.2d at 853.

**81.** *Feagley v. Waddill,* 868 F.2d 1437, 1439 (5th Cir.1989).

**82.** *Id.* at 1439 (citing *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982)).

constitutional protection from destruction of mental health caused by an unstable foster environment.[83] However, the Court said that although such a right may be recognized, damages may be recovered only if a specific right was clearly established by explicit case law at the time of the violation. The court went on to say that there is no clearly established right to a stable foster home environment.[84] Indeed, the Fifth Circuit *rejected* such a right in *Drummond v. Fulton County Dept.*[85] In *Drummond,* the court said that because the foster care system is a creature of state law, and thus can be repealed by legislative act, and because the foster relationship has never been recognized as the equivalent to either the natural or adoptive family, there is no true liberty interest in a foster care relationship.[86]

The Fifth Circuit reiterated that there is no liberty interest in emotional well-being in *Griffith v. Johnston*[87] when the court rejected the argument that children have liberty interests in the uninhibited development of their personalities. The court admonished courts to resist the temptation to augment the substantive reach of the Fourteenth Amendment, "particularly if it requires redefining the category of rights deemed to be fundamental."[88] In light of the Fifth Circuit's admonition and practice not to hastily broaden substantive due process law, and its explicit holdings that children have no liberty interest in uninhibited personality development,[89] their attachments to particular foster families or in stable foster care environments,[90] I conclude that plaintiffs' claims that their emotional well-being has been harmed invokes no constitutionally protected liberty interest.

### C. Placement in a Least Restrictive Setting

■ The Fifth Circuit has held that a committed mental health patient does not have a constitutional right to care or treatment in a least restrictive alternative setting.[91] The court said that the constitutionally required minimum standard of habilitation does not equate to the "qualitative betterment of a retarded person's life," and that "where the state does not provide treatment designed to improve a mentally retarded individual's condition, it deprives the individual of nothing guaranteed by the Constitution; it simply fails to grant a benefit of optimal treatment that it is under no obligation to grant."[92] The Court cited their decision in *Lelsz v. Kavanagh,*[93] in which they rejected a mentally retarded individual's constitutional right to a least restrictive setting. The court based its decision on lower court cases dealing with mental retardates and criminal prisoners that uniformly rejected a right to receive treatment in the least restrictive setting.[94] I find that children in State custody can be analogized to committed mentally retarded individuals because both groups depend on the State for their needs. Therefore, because the Fifth Circuit has found that optimum habilitation of committed mental retardates is not required by the Constitu-

---

83. *K.H. Through Murphy,* 914 F.2d at 850.

84. *Id.* at 853.

85. *Drummond v. Fulton County Dept.,* 563 F.2d 1200 (5th Cir.1977).

86. *Id.* at 1207.

87. 899 F.2d 1427 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

88. *Id.* at 1435 (quoting *Michael H. v. Gerald D.,* 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989)).

89. *Griffith v. Johnston,* 899 F.2d 1427 (5th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

90. *Drummond v. Fulton County Dept.,* 563 F.2d 1200 (5th Cir.1977), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978).

91. *Feagley v. Waddill,* 868 F.2d 1437, 1440 (5th Cir.1989).

92. *Id.* at 1440 (citing *Lelsz v. Kavanagh,* 807 F.2d 1243, 1251 (5th Cir.), *cert. dismissed,* 483 U.S. 1057, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987)).

93. 807 F.2d 1243 (5th Cir.), *cert. dismissed,* 483 U.S. 1057, 108 S.Ct. 44, 97 L.Ed.2d 821 (1987).

94. *Id.* at 1249.

tion, I find that children in State custody also have no right to be placed in the least restrictive foster care arrangement.

### D. Deprivation of Procedural Due Process

■ Plaintiffs assert that they have been deprived of liberty and property interests created by Louisiana and federal law without due process. The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to a prior hearing is paramount. But the range of interests protected is not infinite.[95]

■ A procedural due process claim requires a plaintiff to plead with particularity the state or federal law giving rise to the property or liberty interest and the particular process that was due but not received.[96] Procedural guidelines governing a foster care system can create liberty interests in addition to those discussed in the substantive due process section. However, only procedural requirements that impose a substantive restriction on the acts of State officials create a liberty or property interest protected by the due process clause.[97] The Fifth Circuit has suggested that State laws requiring the provision of services in circumstances that limit substantively the discretion of State officials may create property rights subject to due process protections.[98]

■ Accordingly, I must look to the specific provisions of Louisiana law cited by plaintiffs to determine whether they expand the substantive due process inter-

ests already discussed. Plaintiff's cite three provisions of Louisiana's statutory scheme governing its foster care system that they claim gave rise to liberty or property interests of which they arbitrarily were deprived.[99] These provisions establish State requirements for "case permanency plan,"[100] reports and recommendations of abuse, neglect and sexual abuse,[101] and investigations of prospective foster parents.[102]

Consistent with my analysis of federal law, the State case permanency plan requirement is a procedural requirement. It is an administrative mechanism the State imposes on itself to oversee and plan for the placement and care of foster children. It is not itself a benefit or interest granted to children, but solely a means to the end of benefitting children. While the distinction between procedure and substance is often ephemeral, case permanency plans fall well on the procedural side of that distinction. Accordingly, there is no liberty or property interest in case permanency plans. Furthermore, the case permanency plan requirements under Louisiana law are more extensive than those required by federal law. Plaintiffs' evidence at trial was offered to prove federal violations only. Therefore, I was unable to determine whether there has been substantial compliance with the State requirements.

■ The requirement of an investigation of prospective foster parents confers a substantive benefit to foster children. The only explicit, non-discretionary requirement for such an investigation is that there be a determination of whether the applicant has been charged with a crime.[103] Insofar as this provision confers discretion on the

95. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

96. *Brown v. Texas A & M Univ.,* 804 F.2d 327, 333 (5th Cir.1986).

97. *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983).

98. *Griffith v. Johnston,* 899 F.2d 1427, 1440 (5th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

99. Pls.' Pre–Trial Mem. at 24 n. 12; Pls.' Proposed Findings of Fact and Conclusions of Law, Proposed Finding # 742, Vol. 1 at 124.

100. La.Rev.Stat.Ann. § 46:2418 (West Supp. 1991).

101. La.Rev.Stat.Ann. § 14:403 (West Supp. 1991).

102. La.Rev.Stat.Ann. § 46:282 (West Supp. 1991).

103. La.Rev.Stat.Ann. § 46:282(A).

State in investigating foster parent applicants without providing objective criteria and limitations on that discretion, the provision creates no interest protected by the due process clause.[104] The explicit procedural requirement that the criminal background of the applicant be checked does not expand the substantive due process interests.

■ The State requirements for reports and investigations of abuse and neglect also do not expand the substantive due process interests. However, the requirements are phrased in mandatory terms that benefit particular children who are the objects of the abuse or neglect. Accordingly, I assume that these requirements create a species of protected property interests. Nevertheless, plaintiffs have not alleged what procedural requirement was not complied with, either before or after the alleged deprivation of the asserted interest. Therefore, I am unable to address this procedural due process claim.

## III. *Rebuttal*

■ Plaintiffs request the opportunity to present a rebuttal case based upon evidence about the quality of care afforded children in the Louisiana child welfare system as a whole. After trial was interrupted by the mobilization of defendants' original foster care expert, plaintiffs filed a motion to compel the production of documents they claimed would be relevant to a rebuttal case. The magistrate judge ordered the documents produced. The defendants sought my review and I took the matter under advisement until the close of defendants' case. At that time I ordered the parties to brief whether or not plaintiffs were entitled to present their proffered rebuttal case. Subsequently, I denied plaintiffs' motion to compel and their request to present a rebuttal case. I now assign reasons.

Plaintiffs are not entitled to the production of documents after trial has begun in order to prepare a rebuttal case that was clearly anticipatable prior to trial.[105] It has been known all along that the likelihood of any violations to recur was an issue in this litigation. Accordingly, defendants' motion to review and set aside the magistrate judge's order compelling the production of documents is GRANTED.

■ Plaintiffs also base their proffered rebuttal case on documents already in their possession. These documents relate to the child welfare system as a whole and not specifically to the cases of named plaintiffs. This evidence is not proper rebuttal. At my direction, plaintiffs waited until the end of their case in chief to seek to introduce evidence about the Louisiana child welfare system as a whole. They then offered two arguments for its admission. First, they argued that their evidence would show that the violations they alleged were occurring as to other children in the Louisiana child welfare system. In light of defendants' stipulation that any relief provided to plaintiffs would be provided to all those similarly situated and the denial of class certification, I denied the admission of the proffered evidence on this grounds. Second, plaintiffs argued that their evidence about the State child welfare system could help the court understand why the alleged violations occurred, e.g., that case worker case loads were too high. I considered that if the Child Welfare Act created any rights, proof of their violation did not require proof of causation, and denied the proffered evidence. Importantly, plaintiffs did not argue that this evidence was relevant to whether any violations were likely to recur.

■ Defendants' case included some evidence about the child welfare system as a whole that was offered to show that if there had been violations they were moot. I ruled that plaintiffs could rebut the mootness defense if necessary. It is not. Plaintiffs claims did not fail because defendants actions mooted them. Rather, even assuming the Child Welfare Act created an en-

---

**104.** *Griffith v. Johnston*, 899 F.2d 1427 (5th Cir. 1990), *cert. denied*, — U.S. —, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991).

**105.** Uniform Pre-trial Notice, ¶¶ 10.e & f; 13.b (E.D.La.).

forceable right to a case plan and case review system, plaintiffs failed to present a prima facie case that they suffered any continuing violations. Furthermore, plaintiffs failed to show that there had ever been violations of any significant number of them sufficient to support a § 1983 action seeking an injunction. These failures arose from plaintiffs' own case-in-chief, and they were not at liberty to await a rebuttal case to prove that violations of the law were threatened.

■■■■ Where the defendant's voluntary cessation of allegedly illegal conduct is claimed to moot a case, the defendant bears the "heavy" burden to demonstrate not only that the conflict giving rise to the claim is not ongoing, but also that the effects of any illegality have been completely and irrevocably eradicated and that there is no reasonable expectation that a violation will recur.[106]

However, the burden remains on plaintiffs to justify an injunction. "[T]he moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." [107] Plaintiffs' evidence is unnecessary to meet the defense of mootness, and is offered too late to satisfy plaintiffs' own burden. This is particularly appropriate where the question of the admissability of systemic evidence was addressed at the close of plaintiffs' case. "[Q]uestions as to order of proof are committed to the sound discretion of the trial judge." [108] Plaintiffs evidence is not proper rebuttal.

Accordingly,

Defendants' motion to review and set aside the magistrate judge's order compelling the production of documents is GRANTED.

IT IS ORDERED, ADJUDGED AND DECREED that there be judgment for defendants and against plaintiffs dismissing all plaintiffs' claims at their cost with prejudice.

## APPENDIX A

### REPORT TO THE COURT: DEL A. CASE

### PHILOSOPHY FOR PUBLIC CHILD WELFARE PRACTICE

1. A fundamental goal of public child welfare practice is the protection of children at risk of harm.
2. The current philosophy of public child welfare practice is family centered child focused which requires a conscious balancing of family "right to privacy" and "freedom from intrusion" with the child's right to protection from harm.
3. A basic principle of public child welfare practice today requires that every effort be made to assist families in providing the necessary care and protection of their children in their own home.
4. When families are unable, for whatever reason, to provide the basic care needed for protection and development of their children, and the state must intervene, children should be assured of the necessary and proper care most appropriate for their individual needs.
5. All children placed outside their own home need to be assured of a timely and appropriate plan and the efforts necessary to secure a permanent stable family setting.
6. Public child welfare programs require knowledgeable, skilled, committed personnel who embrace the above principles and are willing to assume the tremendous responsibilities of working with the multiple issues involved with the kinds of families needing state intervention. This type of staff commitment necessitates

---

**106.** *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *American Civil Liberties Union v. Finch,* 638 F.2d 1336, 1346 (5th Cir.1981).

**107.** *W.T. Grant Co.,* 345 U.S. at 633, 73 S.Ct. at 898; *see Posada v. Lamb County, Texas,* 716 F.2d 1066, 1070 (5th Cir.1983); *Finch,* 638 F.2d at 1345, 1346 n. 20.

**108.** *Rodriguez v. Olin Corp.,* 780 F.2d 491, 494 (5th Cir.1986).

the ability to make the professional judgments which assures the best interest of children being served as well as protecting the rights of the parents.

7. Administrators of public child welfare systems recognize the importance of the mandates placed upon the system by lawmakers and taxpayers, to be accountable and effective in the management of public resources.

8. The overriding philosophy of public child welfare practice is the timely provision of the services needed to meet the needs of the family and child which protects the rights and interests of both.

To support the above philosophy a good public child welfare system offers a well integrated and continuous range of services, skilled and knowledgeable workers delivering these services, and an efficient, sophisticated, supportive, and committed supervisory and administrative staff which supports, enhances, and monitors line staff performance, identifies and captures needed resources, makes available the tools and programs which support service provision, and holds every level of the system accountable to fulfilling the agency mission and mandate.

The service components of the Louisiana system which need attention, development and/or enhancement in order to move toward the above stated "good" child welfare system, are as follows:

1. *Skilled, prompt, and sensitive intake service* which provides a highly differentiated assessment and disposition at the point of entry into the system. Crisis intervention and brief service is made available at intake when there is an emergency situation or when brief problem solving may be helpful and appropriate.

2. *Intensive family services* are made available to families that, without such services, would be unable to provide a safe environment for their children and out of home placement appears to be the only option.

3. *Ongoing Family Preventive and Support Services.* These services are made available to marginal families where placement may well not be necessary but help is needed in enhancing the quality of child care and of life for the total family. Such services can reverse the disorganizing and destructive variables undermining family function and prevent further deterioration and perhaps eventual placement.

4. *Foster Care.* This is defined as a short term service to be utilized only in situations where it is impossible for children to remain at home. Foster parents are defined not so much as substitute parents but as team members who work with agency staff and parents toward permanency. Intensive work and case management services are offered to families to help them get to the point where the children can be returned home.

5. *Adoption Services.* These services are utilized when it becomes apparent that the biological family will be unable to resume care of the children. They include helping the parents relinquish parental rights, preparing for court action on termination should the parents be unable or unwilling to do this, and preparing the child for adoption. These services include developing adoptive homes, placing the child, providing services as needed to support the placement, and providing post adoption, even post finalization services to enhance the quality of the adoption and prevent disruption.

6. *A computerized tracking system* through which every child can be located and followed through the continuum of services.

7. *A time schedule* which defines "timely" by setting limits for how long a child or family could remain in any phase of service. This time schedule should be tied to the computerized tracking system so that at any time reports can be generated giving full information on the progress of the caseload and identifying any child or family not moving through the system in a timely fashion.

8. *Shared decision making processes and written records of these processes and decisions.* A thorough assessment and a case plan based on that assessment, formulated by those involved in the situation, shall be developed in each case. This plan is the blueprint that defines services to be delivered, goals to be achieved, and time schedules. The plan is used to direct and monitor progress and should be reexamined on a regular basis and modified if that is proved to be necessary.

9. *A formalized review process* shall exist whereby each case, each plan, and the progress on each plan, is reviewed.

10. *Maintenance of continuity of care.* Administrative procedures and case management must guarantee that cases move through the phases of service and that some continuity of personnel exist. Help is best used and changes accomplished in the context of a supportive and understanding relationship and a great deal is lost when families and children are shifted from worker to worker. Further, it is frequently when families and children move from one service to another with a change in worker and supervisor that they are lost in the cracks. Consistent human connection as well as computer tracking is essential in maintaining a continuity of care.

## PLAN FOR IMPROVEMENT OF LOUISIANA CHILD WELFARE SYSTEM

### INTRODUCTION

The Louisiana child welfare system needs a well integrated and continuous range of services. It needs skilled and knowledgeable workers to deliver these services. And, it needs an efficient, supportive and committed supervisory staff who support, enhance, and monitor line staff. The administration needs to identify and capture needed resources and make available the tools and programs which support the services. It needs to hold every level of the system accountable to fulfilling the agency mission and mandate in order to assure quality services to the children and families in need of assistance. In light of this recognition, the following document is prepared in order to specify the various components requiring initiation and/or enhancement within the current system.

In order to assure a comprehensive, integrated and continuous services system for children and families in Louisiana, this document represents a plan for revising and modifying the current state system. The plan is developed with identified outcomes.

The plan includes four (4) sections. The first encompasses programs and services, specifically reflecting a continuum of services beginning with "up front" programs; then maintenance programming for children and families in the foster care system; and finally the permanent substitute services; i.e., adoption, transfer of custody, and independent living. The second section includes a comprehensive training plan for all staff and foster/adoptive parents, as well as specialized training by program assignment. System and management reorganization and modifications are included in section three. The fourth section contains certain child specific, family focused programming requirements.

### I. PROGRAMS AND SERVICES

#### A. Preventive Services: "Up Front"

Resources will be expanded in the "front-end" of the continuum of child welfare services. These expanded resources and the initiation of such services focused on avoiding or reducing foster care placement reflects good child welfare practice.

This emphasis in reorganization of services would move the agency toward more comprehensive preventive services and provide more resources and services to families to assure that children are not placed in foster care unnecessarily. These up-front components will include three distinct units of service: Child Protective Services; Family Based Support Services; and Intensive Family Services programs.

To assure the enhancement of the current services delivered within the Child Protective Services units as well as the expansion and development of family based services and intensive family services programs the following action will be undertaken.

1. *Child Protective Services*

The Child Protective Services Program will be responsible for the intake function of the agency and will have four components within the intake function. These four components are:

 a. investigation of allegations of child abuse and neglect including determination of risk of harm to the child;

 b. accurate and complete assessment of the family's needs and services required to meet the immediate needs of the child and family to protect the child and, if possible, preserve the family unit;

 c. provision of immediate short-term emergency services to the family and/or referral to family based support services, intensive family services, and/or other community service programs; and

 d. decision on case disposition.

Case disposition and referrals for other services should be completed within thirty (30) days, unless extenuating circumstances involved in completing the investigation are present which should be fully documented in the case summary.

Child protective services staff shall have responsibility for investigations of abuse/neglect allegations in foster homes. Investigations shall be conducted in accordance with agency policy and procedures outlined in Child Protection Policy, Chapter 4, Part 12, and Policy Procedure Memorandum 88–28. The agency plans to review all child protection policy which shall include investigations of abuse/neglect allegations in foster homes.

National child welfare standards adopted in 1988 indicate workers in child protective services should carry no more than 10 to 12 new cases per month and should not exceed a combined caseload of 16 new and ongoing cases per month.

2. *Family Based Services*

The interventions provided by the family based services staff to families in their own homes will include meeting the immediate and urgent needs of the family with services, such as respite or day care, housing or shelter, removal of perpetrator, 24 hour crisis homemaker, and other concrete assistance as may be required. This unit will develop the case plan and make reasonable efforts to assure that appropriate services are provided to prevent placement of children as well as protect children from harm.

National child welfare standards suggest staff should be well-trained child welfare practitioners (Bachelor's degrees and Master of Social Work degrees) with a caseload of 18 to 20 families in a one month period and carry the family for 3 to 6 months of service.

3. *Intensive Family Services*

Intensive Family Services will be expanded in the state system. This type of program focuses on providing highly intensive services to families in their own homes for relatively brief periods of time. The purpose is to avert whatever crisis, or ameliorate whatever family situation, is creating the imminent risk of removal of the children and to enable the family to establish a situation that would permit the children to remain at home and the family together. Nationally, this program has been found to be very effective in preventing placement of children and cost-effective and cost-saving in implementation.

Since it is known, through demonstration and research findings around the country that this program works, the state shall implement a "mixed" delivery approach; i.e., using the private sector and public agency staff to deliver intensive family services. The agency will use family services specialists, MSW staff who are trained in intensive family services in this program, and workers will be responsible for 2 to 4 families during every eight week period. This caseload standard is suggested by nationally recog-

nized experts in the field of practice. This unit will develop the case plan and make reasonable efforts to assure that appropriate services are provided to prevent placement of children as well as protect children from harm.

The agency will collect data to determine the impact of preventive services in reducing foster care placements in selected areas of the state.

The outcomes of an enhanced and expanded preventive service system would include:

a. a better initial assessment of families coming to the attention of the public agency;

b. more efficient use of resources through targeting the children and families most at risk of dissolution;

c. a reduction in the number of children entering the foster care program; and

d. the opportunity for more timely reunification of children with their families with the development of more community-based services to prevent family dissolution.

B. Foster Family Care: Maintenance Programming

When children are removed from their own homes, it is necessary to have sufficient, appropriate and available a wide variety of placement resources in order to meet the needs of individual foster children and their families. The case manager is responsible for working with the family and the child toward reunification of the family unit.

These placement resources should include foster family homes that work with the agency and provide treatment and other specialized services.

The foster family system will be expanded and refined by the agency through the following actions:

1. All categories of foster family care will be clearly delineated among the currently certified homes.

2. All categories of foster homes will be clearly defined in terms of expecta-

tions—both agency responsibility and foster home—by signed agreements—to be developed and signed by all parties.

3. All foster families will be notified of the category they are assigned to and receive appropriate specialized training (see Training, Section 2) to meet the agreement referenced above.

4. Foster family care workers will be assigned workloads that reflect a differentiated caseload which reflects the individual needs of the children served. Workers with children placed in regular foster families will be assigned no more than 20 to 25 children and their families and whatever number of foster homes that entails. Workers with children with special needs will be assigned no more than 15 to 20 children, their families and whatever number of specialized foster families than entails.

5. Two home visits must occur during the first 30 calendar days following placement with one of them being during the first week of placement.

Following the first thirty calendar days of placement, in-home visits between foster parents and the Foster Care Worker and visits between the worker and the child shall be based on need, but shall occur at least once per month.

The visits with the foster parents are in addition to the visits with the foster children. They may occur during the same visit to the home as a visit with a foster child but the meeting with the foster parents shall be separate from the meeting with a foster child.

Visits between foster children and natural parents shall be adhered to as provided in Foster Care Policy 6–615, Page 1–5, and Policy 6–435.

6. No child will be placed in a foster home, including relative placement, which is not approved and supervised by the agency. Emergency placements shall be authorized in accordance with state law.

Foster care and homefinding staff shall participate in abuse/neglect investigations in foster homes as prescribed in Foster Care Policy, Chapter 6, Part 6,

Section 655 and Policy Procedure Memorandum 88–28.

7. Children placed in foster care will receive a complete physical exam upon entering placement and at least annually thereafter.

The outcomes expected from a refined and specialized foster family care system are:

a. reduce the number of children experiencing multiple placements;

b. reduce the average length of time children stay in foster care;

c. provide a timely permanent home for each foster child;

d. provide to each foster child adequate supervision, quality care, and services to meet his/her needs;

e. to involve foster parents in the planning and decision-making process for the children in their care;

f. to involve natural parents (where appropriate) in visitation and planning for the care of their children; and

g. better trained and specialized foster parents to meet the varied needs of the children in the system.

C. Permanent Substitute Services: Adoption

A permanent family for every foster child is the overriding goal of good child welfare practice. As such, the programs for children and families who enter the child welfare system must include services that enable children to return home as their permanent placement or be placed into an adoptive home as a permanent substitute placement.

It is recommended that the agency take the following actions:

1. Recognize that "adoptability" of a child is not a factor in selecting adoption as the goal of the permanent plan.

2. When adoption has been determined as the permanent plan for a child, the agency will secure parental surrender, abandonment judgment, or termination of parental rights judgment in a swift and timely manner.

3. At the time the plan of adoption has been determined for a child, an adoption worker will be assigned simultaneously with the initiation of the efforts of the foster care worker to free the child for adoption.

4. The adoption worker will seek an appropriate adoptive family, prepare the child for adoption, match the child and family, and supervise the adoptive placement until the adoption is finalized.

5. Post-adoption supervision will be provided to adoptive families seeking such service in order to preserve and/or prevent disruption of the adoption.

Supportive agency services will be developed to enable the adoptive placement of children needing this service. These supports will include:

1. A statewide adoption exchange system

2. A system which assures placing all special needs children for whom no instate placement has been identified on regional and/or national exchange networks which indicate their availability for adoption and provides a national search for an adoptive home.

3. A comprehensive media plan for the ongoing recruitment of adoptive families with state staff assigned to implement the plan.

4. A recruitment and training program designed for all potential adoptive families which is efficient and timely in approving the adoptive homes.

5. Develop a monitoring system for all children freed for adoption which is designed to assure that no child waits longer than 12 months for an adoptive home.

6. All adoptive applicants will be informed of the procedures and resources necessary and available for adoption subsidies for children in the state system.

7. Legal services will be provided by the state to assist the staff and families adopting a foster child in processing court actions necessary to finalize adoptions.

The outcomes expected from an efficient and timely adoption program include:

1. Effecting permanent placements for children as early as possible following foster care placement through thorough assessment, case planning, timely decision-making and periodic review of progress to assure that children and families move through the system in a timely manner;

2. Reduced "drift" in foster care;

3. Cost-savings to the state by moving children out of the system; and

4. Enabling children to receive care in an environment with consistency and permanency in their formative years to allow for growth and development into healthy, productive adults.

The determination of workloads in the adoption service should consider time for completion of intake; assessment and preparation of the child; assessment and preparation of adoptive applicants; matching and supervising the child in the adoptive family; and post-placement and post-legal adoptive services.

National child welfare standards of practice indicate adoption workloads should be specialized as follows: staff working with younger children under 8 years of age should have no more than 20 active cases and workers with older special needs children should carry no more than 10 to 12 active cases. Adoption workers will be MSW staff who receive specialized training in adoption practice.

To enhance and improve the adoption practice within the agency, the agency will make available to the professional staff the assistance of nationally recognized adoption consultants.

D. Establishment of Transfer of Custody

1. Agency program staff shall consult with agency legal staff on design of a service system for establishment of transfer of custody for foster children in relative placements in order to effect permanent placements. Program development will include assessing the feasibility of implementing a transfer system including receptivity of the courts, provision of legal services, fees for services, referral packets, policy and payment mechanisms.

2. Every relative placement for a foster child shall be reviewed at the regularly scheduled six month review and an assessment made as to whether lack of establishment of transfer of custody is a barrier to a permanent substitute placement for the child.

3. In those cases in which the relative and the child desire the establishment of transfer of custody and do not have the financial resources for the requisite legal services, those services shall be provided by the agency.

4. In each subsequent six month review hearing for the child in relative placement, such a determination shall be made, unless return home, adoption, or independent living is the permanent plan for the child.

E. Plan for the Recruitment of Foster and Adoptive Families

Recruitment, screening, training, supervision and monitoring of the required family resources necessary to meet the needs of foster children in the state system is a specialized function of a homefinding unit within the child welfare system. Therefore, to assure that a variety of specialized temporary and permanent families are secured for all children in and coming into the system, the agency will take the following actions:

1. A statewide recruitment plan will be developed and include resources for mass public media publicity aimed at securing a pool of potential foster and adoptive families.

2. Following the development of the plan, state staff will implement a screening process for all potential applicants.

3. Following the screening of applicants, orientation training will be conducted for all families prior to the placement of any child except for the emergency circumstances provided in state

law and within 3 months of the applicant's initial inquiry into the program.

4. State homefinding staff will monitor and supervise the performance of all families on a regular basis using professionally developed criteria.

5. Homefinding staff will develop and operate an ongoing recruitment campaign on a statewide basis to add to the pool of family resources.

6. Homefinders will screen and train new applicants on an ongoing basis year round.

7. Homefinders will develop and implement screening and review mechanisms to assure that inappropriate foster or adoptive families are not approved and/or are removed from the program through professionally defined criteria.

8. The newly established state homefinding unit will look at all aspects of this service including existing functions and make any recommendations concerning necessary changes in the agency program. The agency professionals will have resources available to seek consultation from an expert in the field, if necessary.

## II. COMPREHENSIVE TRAINING PLAN

A. The agency will design and implement and consistently provide an orientation program for all new workers (no less than 32 hours) which consists—but is not limited to—the following content:

1. Role and responsibility of professionals in public child welfare

2. Child growth and development

3. Interventions with families: philosophy and purpose

4. Interviewing skills and techniques

5. Intent and mandates of P.L. 96–272

6. Overview of the continuum of agency services

7. Case planning

B. All employees shall receive individualized on-the-job training and formal classroom training prior to exercising responsibility for cases. The completion of the agency's required formal training may be delayed on an emergency basis if the unavailability of these employees pending such training would result in the agency's inability to meet the needs of abused or neglected children or to satisfy legal mandates, provided that the required formalized classroom training may not be delayed beyond sixty days.

The agency shall design and implement a minimum of seven specialized curricula for in-service training to be provided within six months of employee assignment for no less than 32 hours of instruction. The areas of specialization shall include but not be limited to:

1. Intensive family services, values, skills, and knowledge geared toward preservation of families in which a child is at risk of placement

2. Home-based family services

3. Intake and crisis intervention including child risk assessment and family assessment

4. Foster family care services

5. Specialized adoption programming

6. Foster and adoptive homefinding services

7. Manager/Supervisor training: function and process

C. Each specialized curricula will be delivered to all current staff (including supervisors and program specialists) assigned to each service area.

D. All staff will attend staff development activities appropriate to their work assignment annually at the rate of no less than 32 hours per year either provided by the agency or offered outside the agency.

E. The foster parent training program shall include the following:

1. A minimum of 20 hours of orientation required of all prospective foster

parents consisting of at least the following content:

a. What is Foster Parenting?

b. The Foster Child in your Home

c. The Child's Natural Parents

d. Working with the Agency

e. Foster Parents as Team Members with the Agency and the Community

f. Placement

g. Legal Aspects of Working with Foster Children

h. Preparing Children for Return Home and/or Adoption

2. Ongoing in-service Specialized Education required of foster parents. The state will design and implement specialized in-service educational programs to be offered at least annually in at least the following areas to foster parents serving children with these characteristics:

a. Foster Parenting Adolescents—minimum of 15 hours per year

b. Foster Parenting Children with Special Physical Needs—15 hours per year

c. Foster Parenting Children with Emotional Problems—15 hours per year

3. In addition, the state will design and implement similar orientation and specialized education required of prospective adoptive parents of children to be offered during the homestudy process. Following placement of a special needs child, adoptive parents will be offered the specialized annual training provided to foster parents.

4. The state will develop, provide, and require ongoing educational sessions for the family service aides and transportation aides that include an orientation and a minimum of 8 hours of education every six (6) months. The content will include, but not be limited to:

a. Child care; i.e., child growth and development

b. Family relationships; i.e., effects of deprivation, separation

c. Home management, meal planning, housekeeping, budgeting, etc.

d. Services of social agencies and other community services

e. Role of family aide and/or transportation aide as agency team member

## III. SYSTEMIC REORGANIZATION: MANAGEMENT AND ADMINISTRATION

### A. Uniform Case Records

A statewide uniform case record system is essential if real coordination, communication and consistent service is to be provided to families and children in Louisiana. The uniform records needs to be designed to provide for monitoring of case progress. Therefore, it is agreed that a total system review of all records will be completed to assure compliance with a uniform format designed by the system for all case records. Case record content will provide a means by which the history of every child, the location of the child, the services needed and the services provided to every child and his/her family can be determined.

### B. Management Information System

The agency computerized tracking system should provide a means by which every child can be located and followed through the continuum of agency services. The computerized tracking system will provide for generation of reports providing information on progress made toward client goal achievement and services needed for children and families to assure movement through the system in a timely fashion.

### C. Fiscal Management

Fiscal enhancement requires that the agency capture all federal dollars available for the provision of mandated child welfare services. Therefore, maximum effort and priority must be given to pursuing federal funding and reimbursement. Toward this end the administration of the agency will review every quarter the results of federal funds earned, paid and owed to Louisiana and new funds or reallocated funds available from federal initiatives. Service enhancement through reallocation of current

funds necessary to capture federal funds will be given consideration and if feasible additional federal funds or freed-up state funds within the agency's budget will be applied to avoid foster care placement, reunify families, effect permanent substitute placements or to provide more timely services to children in foster care.

In addition the agency will work collaboratively with external organizations, such as universities and private agencies to secure demonstration and research federal funds in their efforts to expand and enhance programs.

Fiscal management requires coalition and collaborative efforts to assure fiscal responsibility and effective use of limited resources. Therefore, the agency will review its fiscal operations and assign staff to continually review the growth and/or status of funds.

Finally, all purchase of service contracts in the children and family service programs will be reviewed on an annual basis to evaluate program effectiveness and cost effectiveness. Specific and adequate monitoring and accountability standards will be developed and implemented with service providers. Where necessary, due to noncompliance with contract provisions or unsatisfactory monitoring findings, providers will be terminated from agency contracts.

## IV. CHILD SPECIFIC, FAMILY FOCUSED PROGRAMMING

In order to assure that families and children receive the services necessary to meet their needs, the following continuum of services and activities will be implemented or enhanced by the agency:

A. Service programs will be developed, enhanced, and provided as needed to prevent the unnecessary placement of children into state care.

B. To assure that permanent planning occurs for individual children the agency will develop a written case plan and case review system which is designed to achieve placement in the least restrictive setting and in close proximity to parents, for each child in care in accordance with current agency foster care policy.

C. Children and families will receive services identified in the case plan and case review system as necessary to return the child home or effect a permanent placement for the child.

D. The system will insure that procedural safeguards are provided to all parents and children involved in the state agency system.

E. Service programs will be developed, enhanced, and provided as needed which assure that children will be reunited with their families when this action is in the best interest of the child. If a plan of return home is proposed for a child after the child has been in care over 18 months, the plan must be documented in the record that the parent is in frequent and continuous contact with the child, is availing himself/herself of services necessary to enable the child to return home, and that return home can be reasonably expected within six months.

F. Every child who is eligible for permanency through adoption will be reviewed for adoption assistance. Every child who is eligible for permanency through transfer of custody shall be reviewed for legal assistance.

G. Long-term foster care as the permanent plan will be recommended by the agency only when return home, adoption, transfer of custody, or independent living for older adolescents (age 16 or over) is not possible after every effort has been made to provide permanency through reunification and/or other above identified permanent plans.

H. A permanent plan will be recommended to the court exercising juvenile jurisdiction on all foster children within eighteen months of placement into care.